(No. 25371.—

JOSEPH P. LEWIS *et al.* Appellees, *vs.* THE WEST SIDE TRUST AND SAVINGS BANK *et al.* Appellants.

*Opinion filed February 14, 1941—Rehearing denied April 2, 1941.*

24

Shaw, J., dissenting.

Poppenhusen, Johnston, Thompson & Raymond, Hyman J. Rosenberg, Haffenberg & Rosenbaum, Winston, Strawn & Shaw, George W. Ott, John M. Lee, Carl M. Loos, Brown, Fox & Blumberg, Mayer, Meyer, Austrian & Platt, Isaac S. Rothschild, Levinson, Becker, Peebles & Swiren, Moses, Kennedy, Stein & Bachrach, Pope & Ballard, Thomas G. Deering, Krinsky, Levitan & Glassner, William E. Anderle, D'Ancona, Pflaum & Kohlsaat, Wilhartz & Hirsch, Sonnenschein, Berkson, Lautmann, Levinson & Morse, Arkin & Berman, Ashcraft & Ashcraft, Bayley, Webster, Gregory & Hunter, Samuel Blair, Rudolph F. Bostelman, David A. Canel, James Colburn Hamilton, Archie H. Cohen, Morton B. Hochberg, W. J. Colo-

HAN, JR., JACOB DIAMOND, HARRY C. DIAMOND, BELL, BOYD & MARSHALL, CHARLES M. GERINGER, LOUIS T. HERZON, KAMFNER, HALLIGAN & MARKS, S. A. KARLIN, LOWENHAUPT & WOLFF, MCINERNEY, EPSTEIN & ARVEY, NORMAN NAIMAN, PRUITT & GREALIS, JOSEPH ROSENSTEIN, BAILEY SAMELOW, ARNOLD SEEDER, DAVID J. SHIPMAN, SUGARMAN & ROTHMAN, WELCH & HOFFMAN, SIDNEY WOLFE, SAMUEL C. HORWITZ, and WARD, CURTIS & POLIN, for appellants and cross-appellees.

WARREN H. ORR, GOLD & LIEBMAN, and PHILIP H. MITCHEL, for appellees and cross-appellants.

LEO WAXMAN, (MAURICE W. LEE, of counsel,) for Samuel R. Ballis, receiver and cross-appellant.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Plaintiffs, appellees and cross-appellants, on behalf of themselves and other creditors of the West Side Trust and Savings Bank of Chicago, brought representative suits against former and final stockholders of the bank to enforce the liability imposed upon bank stockholders by section 6 of article 11 of the Illinois constitution. On March 4, 1933, Joseph P. Lewis filed his suit in the superior court of Cook county to enforce stockholders' liability. Four similar suits were filed thereafter, but, by orders of court, the five were consolidated, and the prosecution of four other suits was enjoined.

The West Side Trust and Savings Bank of Chicago was organized June 21, 1905, to do a banking business, with a capital stock of $200,000, divided into 2000 shares of $100 par value. On December 23, 1911, its capital stock was increased to $400,000. On September 9, 1920, the capital stock was increased to $700,000, and on February 1, 1924, the bank was authorized to accept and execute trusts and

to receive deposits of trust funds. On August 1, 1929, the capital stock was increased to $1,000,000, where it remained until the bank closed. On March 3, 1933, the bank placed a limit of two per cent on withdrawals from depositors' balances as of the close of business on March 2, 1933. On March 4, 1933, the bank closed and the Lewis suit was filed. The Auditor of Public Accounts began an examination of the bank on March 28, 1933, and on December 19, 1933, he determined the bank was being conducted in an unsafe manner and that its capital had become impaired to such an extent that the impairment could not be made good. He assumed control of the bank and on January 12, 1934, appointed a liquidating receiver. In connection with the liquidation a suit was filed in the superior court of Cook county on the same day. The plaintiffs in the stockholders' suit filed a second amended and supplemental bill of complaint on December 7, 1934, and defendants filed answers thereto denying generally the allegation of the amended and supplemental bill. Replications to the answers were filed and the cause was referred to a master in chancery. On June 23, 1937, the master made his original report to which both plaintiffs and defendants objected. For the most part, these objections were overruled by the master in his first supplemental report of September 16, 1937. After a hearing upon the exceptions to the master's report on November 20, 1937, the cause was rereferred to the master to take further evidence and render a supplemental report containing a calculation of the unsatisfied liabilities accruing during each period of stock holding, after deducting all credits, deductions and set-offs. The master made a second supplemental report on November 14, 1938, in which he found that the unsatisfied liabilities had been reduced by what had taken place in the liquidating receivership up to and through February, 1938. Objections and exceptions to this report were overruled and a decree was entered on June 2, 1939, adjudicating the lia-

bilities of the defendants. The decree was amended four times and was vacated as to defendants Regenery and Coleman. Edward Morris, Jr., Nelson Morris, and Helen Swift Neilson filed notice of appeal and several other defendants filed notice of separate appeal as co-parties. This case is numbered 25371 in this court. Plaintiffs filed cross-appeals from certain orders of the court and separate appeals were numbered 25415, 25416, and 25417, and the causes have been consolidated for hearing.

While this case was under advisement, the individual members of the Morris family, and such other parties as had to do with the various interests of the Morrises, made a compromise with plaintiffs. As a result, an order was entered August 21, 1940, by which this settlement was approved and causes numbered 25415, 25416 and 25417 were dismissed. The cross-appeals in cause No. 25371 were dismissed as to the following defendants: Edward Morris, Jr., Nelson Morris (also known as Nelson Swift Morris), and Helen Swift Neilson, Walter Kjoss; Edward Morris, Jr., Helen Swift Neilson, Thomas E. Wilson, Nelson Morris, Helen Swift Neilson, and Edward Morris, Jr., described in the decree appealed from as executors of the estate of Edward Morris, deceased, and sued in the second amended and supplemental bill of complaint as executors of the last will and testament of Edward Morris, deceased; Herbert E. Kerber, Henry C. Schwab, Thomas E. Wilson, Edward Morris, Jr., Nelson Morris, and Helen Swift Neilson, Francis Neilson, Carl L. Jernberg, Nelson Morris, Charles A. Jernberg, Oliver A. Bestel, with respect to that part of the decree against him aggregating $15,855.82, and the First National Bank of Chicago, with respect to that part of the decree against it aggregating $48,300, based according to the decree on the holding by its predecessor of stock in the West Side Trust and Savings Bank as trustee for Ruth May Morris Bakwin, Helen Muriel Morris Abramson, and as trustee for Helen Swift Morris

Neilson. It was stipulated that the decree against Oliver A. Bestel should be reduced by $15,855.82 and against the First National Bank of Chicago by $48,300 and this was ordered done.

A settlement was reached between the plaintiffs and the First National Bank of Chicago, as executor of the last will of John A. Spoor, deceased, and the First National Bank of Chicago and Oliver A. Bestel, and a similar order was entered December 21, 1940, as to these defendants, appellants. This results in only a part of the matters remaining before us that were involved in cause No. 25371.

In their brief, plaintiffs have renewed their motion to dismiss the appeal in 25371, because they assert they were not made appellees in their representative capacities. On October 18, 1939, this court denied this motion, and we will not again consider it. If the parties to any case apprehend that the court has fallen into error in the decision or disposition of a motion, the proper practice is to apply at the same term of the court at which the decision upon the motion is entered, for a reconsideration of the action of the court upon the motion. *Village of North Chicago* v. *American Steel Co.* 221 Ill. 539.

Defendants contend that under section 6 of article 11 of the constitution, the plaintiffs had the burden of proving the essential elements of the case to establish the liabilities of the stockholders. They say that plaintiffs had to prove (1) who were the creditors of the bank, (2) what were the unsatisfied net liabilities of the bank to each of its creditors, and (3) when these liabilities respectively accrued, and that they failed to sustain this burden. In short, defendants contend that plaintiffs were bound to prove the net amount due to each creditor, after allowing all credits, set-offs, and counter-claims in favor of the bank. Plaintiffs insist the burden was not on them to show either offsets or payments. According to the theory of the defendants, the audit introduced in evidence was incorrect, because it considered only

the liability side of the bank's books. In answer, plaintiffs point out that the matter of bank's assets,—*i. e.,* offsets against bank liabilities, are shown in the books of the bank and its receiver, and such claims as had been allowed and paid were, in fact, used to reduce the liabilities. The audit was made at the bank premises from the books of the bank showing liabilities. The accountant first set up all the liability accounts, applying the "first in, first out" rule to savings and checking accounts. The accounts were identified and transcribed, showing the respective balances due when the bank closed. To the amount of the last deposit was added the last prior deposits sufficient to equal the amount of balance due the depositor. From this information was prepared the accrual sheets, in sequence of dates. The accrual sheets were totalled and balanced with the records of the bank. The totals were tabulated in sequence of dates, showing totals of accruals from time to time. The accountant then prepared a tabulation of stockholdings, from the stock books and cancelled stock certificates in evidence, the numbers of certificates, number of shares, and their par value. He then computed the liabilities accruing against the various stockholders by checking the period of their stockholding against the accruals for that period. Deductible assets were taken from the records of the receiver's books, including set-offs and claims paid. After deducting as credits all set-offs shown by the receiver's books, the balance was set forth as the liability. While the receiver's books were not admissible in evidence against the defendants, the use made of them reduced their liabilities and they cannot be heard to complain.

We cannot agree with the contention that section 6 of article 11 of the constitution should be construed in such a manner as to require plaintiffs, in a representative suit against stockholders of a State bank, to establish not only the liabilities, the time they accrued and the persons who were stockholders, and what number of shares they held,

but, in addition, to prove all counter-claims and set-offs against the creditors. The defendants have referred us to no authorities holding that this additional proof is required of plaintiffs. They make a *prima facie* case by proving the same things that would be required in a suit against the bank itself, (*DeLand* v. *Dixon Nat. Bank,* 111 Ill. 323,) plus the proof as to the time the stockholders held their stock, and the number and par value of their shares. We have held, without exception, that stockholders are primarily liable, liable as the bank would be for liabilities that accrued during their stock ownership, limited only by the par value of the shares they held respectively. It would be inconsistent to hold as we did in *Heine* v. *Degen,* 362 Ill. 357, that the defendant stockholders could not require proof to be made of all claims against the bank before the suit against the stockholders proceeded to a decree, and to now hold that plaintiffs, in a representative suit, must not only show the liabilities, but must show, in addition, the cross-demands of the bank against its creditors, and the creditors' evidence in rebuttal of such counter-claims and cross-demands. The fact that this is an equity suit does not change the rule that a defendant has the burden of proving defenses he may have to the action. It must be remembered that these defendants had access to the books of the bank and an opportunity to show therefrom that their liabilities should have been further diminished or wiped out entirely by reason of claims the bank had against its creditors. They also had copies of the audit a sufficient length of time in advance of its introduction in evidence. They have failed to point out wherein they or any of them suffered damage by reason of the fact that plaintiffs were not required to make the proof they insist on. Defendants rely on *People* v. *Sawhill,* 299 Ill. 393, but that case required the use of all of the books of the corporation to show its financial condition. It was a criminal prosecution involving a charge of obtaining money under false pretenses and the

confidence game. It is not authority in support of defendants' contention that the witnesses who prepared the audits should have used all of the books of the bank, instead of using the liability books. We have already pointed out that the use of the receiver's books benefited the defendants. Defendants cross-examined the accountants who prepared the audit exhibits in evidence and they have not shown the audits were inaccurate, except in a few minor items.

The liability books of the bank were admissible as admissions against interest of the stockholders who held stock when entries contained in the books were made that show liabilities accrued during their particular ownership of stock. The same is true as to such entries and each succeeding class of stockholders. The testimony shows that, as we have pointed out, the rule in *Clayton's case,* 1 Meriv. 572, was followed in making up the audits in evidence, and the witnesses who made them determined the time of accrual of liabilities by taking the final balance due a creditor the day the bank closed and determining what last deposits were made by the creditor, the total of which would equal the balance due him. Here, again, the defendants cannot complain of such use of the books of the bank, because they would have had the right to demand that this be done. It was competent against a then stockholder to show every such deposit as an admission against his interest, and it does not follow that it was error, because the effect would be to reduce the liabilities of some prior stockholder in whose period of ownership the particular checking or savings account may have been opened.

The defendants say the foundation was insufficient to admit the books of the bank in evidence and that the audits were not admissible for the same reason. The liability books were used against the defendants only in so far as they contained admissions against interest. All that was required by way of a foundation, either as to them or the stock books of the bank and the cancelled stock certificates,

to make admissions therein contained admissible, was the showing that was made that these were the liability and stock books of the bank and the cancelled stock certificates. It should be noted that there is no contention that any liability entry taken from the liability books of the bank, or statement as to the name of a defendant given as a stockholder as shown by the stock books, was erroneous.

The defendants are in error in saying that the plaintiffs represented by attorney Mitchel repudiated the audits in evidence. The objection made was to the allowance in the audit of credits in favor of the bank, and, therefore, in favor of defendants, because they reduced their liabilities. This did not amount to a repudiation, and those plaintiffs are not now complaining of the ruling against their objections.

The next attack made on the audits is based on the fact that they included trust funds as liabilities. Defendants say: "In 1870 no bank had any power to do trust business." But the very first sentence in *Eames* v. *Doris,* 102 Ill. 350, is: "The bank, here, by its charter, was empowered to transact ordinary commercial and other business, as well as to receive saving deposits and trust funds." That bank was incorporated under an act approved February 21, 1861, and the case was decided in 1882. Defendants rely on *Reed* v. *People,* 125 Ill. 592, but that case, when analyzed, holds that an act to provide for the organization of savings societies, or institutions for savings, even though there were no stockholders, was such an act as was required to be submitted to a vote of the people pursuant to section 5 of article 11 of the constitution, because the act related to banking. There is no proof that at the time the constitution was adopted "creditors" and "liabilities" excluded depositors of trust funds or the beneficiaries of trusts and the trust funds themselves. We have held stockholders have a contractual liability under the constitution. There is nothing to exclude trust funds from the liabilities the bank contracts to pay. Defendants say this construction dis-

criminates against creditors of trust companies other than banks, and denies them the equal protection of the law. In both instances, the rights and liabilities are contractual, and, therefore, this contention has no force.

Defendants claim that it was impossible to determine the liabilities of the bank six months before it closed. They say that "the float" should have been taken into consideration. By "float" is meant checks in the process of collection which, when entered in a depositor's account, remain conditional credits until the checks are paid in money or solvent credits. They say unless these conditional credits are taken into consideration the audits are erroneous, that the books of the bank will not show when such checks become unconditional credits, but they do not show how any defendant was adversely affected by any such item or that there was any single check or group of checks which was not collected. The answer to this contention is that the debtor-creditor relationship is established when the check is deposited, but that the bank has the right to terminate it and charge the check back against the account if it is not collected. If it is collected the debtor-creditor relation ceases to be conditional and becames absolute as of the date of the deposit. In *People* v. *Sheridan Trust and Savings Bank,* 358 Ill. 290, 300, this court said: "By the deposit of the check in the general checking account of the candy company, the relation of debtor and creditor was created, but by force of the agreement and custom applicable to out-of-town cash items the agreement suspended the relation of debtor and creditor pending the collection of the check. The credit given to the candy company was a conditional credit operative during the time that the Sheridan Bank was undertaking the collection, in due course, of the check."

Some "flag" memoranda (marginal notations) appear on some of the liability ledger sheets, but the burden was on the defendants to show that the relation of debtor and

creditor had not become absolute and this they have not done. They point to no check that came back unpaid. If they did, and it had not been subtracted from the account of the depositor, this would be error. This contention must be overruled.

Defendants say that plaintiffs had due and timely notice of defendants' theory of the case and their contentions, and that the decree should be reversed without remandment. We cannot agree with this contention.

The defendants urge that the judgments against many of them for liabilities as intermediate stockholders were excessive (1) by reason of the fact that the chancellor did not give effect to the reduction of liabilities which accrued during their periods of ownership accomplished by payments and tenders of payment made by stockholders, and (2) by reason of double holdings of the same defendants for the same liabilities. Plaintiffs say that this point was not saved for review. It is neither necessary nor proper to object to a master's conclusions of law or to file exceptions to them. (*Sartain* v. *Davis,* 323 Ill. 269; *Gillett* v. *Chicago Title and Trust Co.* 230 id. 373.) The record shows these points were presented and preserved for review. Defendants' contention as to the effect of payments by other stockholders is based upon what we said in *Burket* v. *Reliance Bank and Trust Co.* 366 Ill. 98, to the effect that if a group of stockholders pays a sum equal to the liabilities that accrued during their period of ownership, their liabilities are satisfied. Defendants contend that every time a payment is made the liabilities of the whole period, or of the various periods during which the paying stockholder held stock, must be reduced *pro rata.*

In *Comstock* v. *Morgan Park Trust and Savings Bank,* 367 Ill. 276, we held that stockholders' liabilities are reduced before the decree in the creditors' representative suit by payment of dividends by the liquidating receiver of the bank. Payments of their liabilities by defendant stock-

holders are *in invitum* and not of a voluntary character. The cases plaintiffs cite (*Monson* v. *Meyer,* 190 Ill. 105; *Hare* v. *Stegall,* 60 id. 380; *Wilhelm* v. *Schmidt,* 84 id. 183;) wherein the court applied payments to unsecured or poorly secured parts of defendants' indebtedness are not applicable here. By what the plaintiffs contended and the chancellor embodied in the decree, payments by stockholders operated to reduce liabilities that accrued in that part of the period of ownership where the greater amount of liabilities accrued. The effect of this was to create two periods of ownership out of one. The holding was that only where that period of ownership of paying and non-paying stockholders was co-extensive, would liabilities be reduced by the payments made. The cases defendants rely on, such as *Hems* v. *Arnold,* 188 Ill. 527, and *In re Bates,* 118 id. 524, are more nearly in point. The damages sought against individual stockholders are of the same class and grade. The fact that more money would probably be paid for the benefit of creditors is not a factor. These payments are applied by law and there is no discretion and no principle of equity involved. If a stockholder pays the amount he owes before the decree, it extinguishes the liabilities *pro tanto* and *pro rata* that accrued during his period of ownership. If the judgment included more than one period of ownership, it is admitted the payment can be divided readily and the parts can be applied to the different periods. Plaintiffs say there were 900 periods of stock ownership and that the decree would have to be rewritten every time a payment is made. We are not now dealing with payments after decree. As to payments before decree, a table showing what a holder of a single share would have to pay by reason of his ownership of it during the particular period, and what payment in full would reduce the liabilities of that period can be prepared. It does not make any difference in preparing such a table that a particular stockholder's period of ownership extends into or is included wholly within an-

other period of stock ownership. To hold otherwise would mean that by the method of application employed by the chancellor, part of a group of stockholders in a given period would be paying to extinguish all the liabilities, without recourse against others, who also held stock in that period. The holding in *Burket* v. *Reliance Bank and Trust Co. supra,* has implicit in it not only that if one or more stockholders pay in an amount equal to the total liabilities that accrued in their period of ownership, this discharges all that group as defendants, but that if one or more pay half the liabilities, before the decree is rendered, the remaining half of the liabilities is the measuring stick to be used in assessing damages against the remaining stockholders of that period. It follows that in not thus applying the payments made before the decree was rendered, the chancellor erred. It is not necessary to lengthen this opinion by setting out each case in which this happened. As to the appellants thus affected the decree must be reversed and the cause remanded, with directions to apply payments made before the decree was rendered, as above indicated, before assessing damages.

As to payments made after a decree in a representative suit against bank stockholders, until a particular group of stockholders have paid an amount equal to the liabilities that accrued in their period of ownership they are not entitled to any reduction in the amounts found due, respectively, from such of them as have not paid. When and if such payment is made in full, the remaining stockholders in that particular group may seek and should receive relief by satisfaction of the judgments against them in so far as they were the result of liabilities that accrued during that period of ownership. There was no error committed in not taking into account payments made after the decree. Nor was error committed by the refusal to embody in the decree the paragraph dealing with payments to be made after the decree. Likewise the chancellor did not err in refusing to direct the plaintiffs and the receiver in the creditors' suit

to accept the conditional tenders made by certain defendants. They amounted only to offers to pay a part of the damages assessable against the particular defendants. As to such tenders as were made after the decree was rendered, they would be either in discharge or partial discharge of the amounts decreed to be paid and could not be considered in assessing damages in the decree.

The defendants' contention that a greater total amount cannot legally be assessed by way of damages against the owners of stock in a particular period than the liabilities that accrued during that period is untenable. The liability of a stockholder is individual and primary. The creditors are entitled to a decree against him individually, limited only by the par value of his stock and the liabilities which accrued during his period of ownership, whichever may be the lesser sum.

Defendants do not point out what specific items of liability would be affected or how the damages assessed against any of them would be reduced, but they insist that the court erred in refusing to hold that the ten-year Statute of Limitations applied to checks and money orders which were liabilities that accrued during the period from January 15, 1906, to January 1, 1924. They also say that it was error to hold that the five-year Statute of Limitations did not bar the creditors' rights against former stockholders who had sold their stock five years or more before the bank closed. They rely on one sentence from *Sanders* v. *Merchants State Bank,* 349 Ill. 547, 564, as follows: "The stockholder is under no stricter liability than the bank, but under the constitution his liability is identical with the liability of the bank during the time he remains a stockholder and not something different." They contend that when he ceases to be such stockholder his liability changes its character and that creditors could and should then have demanded payment of him in order to hold him liable. Plaintiffs rely on the sentences immediately preceding that quoted

from the *Sanders case*. Here, as in the *Sanders case,* we are of the opinion that the nature of the creditors' claims would determine what Statute of Limitations would be applicable. It is an affirmative defense and no proper basis is furnished by this record for a discussion of the Statute of Limitations since appellants do not point out in any manner what particular liabilities would be barred and since appellants argue only the untenable contention that intermediate or former stockholders are not liable if five years had elapsed after they transferred their stock, before the bank closed. There is no difference or distinction in the liabilities of final and former stockholders as to the time creditors may sue them, and the same rules as to the necessity or waiver of a demand apply to all stockholders. When the bank closes, of course, no demand is necessary, and that is the day the Statute of Limitations begins to run in favor of the stockholders, generally. There may be creditors' claims against the bank which would be barred as against the bank and, therefore, as against stockholders, but defendants do not point out any such claims and we have no duty or way to search them out. A full discussion of these questions is contained in *Burnet* v. *West Madison State Bank,* 375 Ill. 402.

The defendants next insist that the case was not properly on reference before the master, because the suit of Irene Lewis against the West Side Trust and Savings Bank, in which only a complaint had been filed, was consolidated with the present cases, which were at issue and had been referred to the master in chancery. This was done on the court's own motion and the decree vacated the particular order of consolidation. The defendants did not move to vacate the order when the Irene Lewis case was consolidated with the others and if there was error it was harmless to them. They participated in the hearings before the master, the evidence taken was in the present suits which had been earlier con-

solidated, and defendants later sought and obtained a re-reference to the master.

The plaintiffs have cross-appealed from that part of the decree which found that Albert H. Kern, Abe Seifer and William Laser were not stockholders. The facts concerning each of these persons are sufficiently alike to justify their joint consideration. The chancellor reached a correct conclusion, as a brief reference to the facts will show.

On September 17, 1929, Albert H. Kern, as president of the Sidell Woodworking Company, purchased twelve shares on behalf of his company and its bank account was charged with the purchase price. Ten days later a certificate for these shares made out in his name was delivered to him. He immediately advised the bank of the error and requested that it be corrected. He endorsed the certificate at the instance of an officer of the bank and a new certificate was issued to the Sidell Woodworking Company, on September 30, 1929.

Certificate No. 1041 for five shares was in the name of William Laser on the records of the West Side Trust and Savings Bank from December 9, 1929, to May 16, 1930. Laser testified that, in December of 1929, an officer of the bank, Mr. Heymann, told him he should be a stockholder. Laser refused, but when he received his bank statement at the end of the month it showed a debit of $1925 for five shares of stock. He demanded his money back. He was told that Heymann was on a winter cruise and that he would have to wait until he returned. In the meantime he received a dividend check which he returned. He never had the stock in his possession and the money was credited back to his account. The cashier allowed him to draw checks against the $1925 while Heymann was away. He signed a receipt for the certificate and endorsed the certificate back to the bank. The facts concerning Abe Seifer are like those concerning Kern. He was manager of the

Northwestern Wet Wash Laundry and the stock was bought by him for the company, and, by mistake, was issued to him personally. The mistake was corrected soon after its discovery. It is a question of fact as to who were the stockholders of the bank and the findings of the master approved by the chancellor must be given due weight. In all three instances, there was no intention on the part of these men to buy stock in the West Side Trust and Savings Bank for themselves and we are of the opinion that the individuals named promptly disaffirmed the action taken by the bank in placing their names on the records, so that no estoppel could arise against them. Their endorsement of the stock at the request of the bank officials so that the certificates could be cancelled does not show acceptance of the stock or ratification by them. The signing of a receipt for the certificate by Laser, taken alone, tends to show an acceptance of the shares of stock, but this act was immediately followed by others which showed a positive intention not to become a stockholder. He protested at once to the officers of the bank, tendered back the certificate, retained the right to check against the $1925 charged against his account without his consent, refused to accept a dividend check and endorsed the certificate so that it could be cancelled. The chancellor correctly held these three men never became stockholders.

Plaintiffs urge on cross-appeal that the chancellor erred in sustaining a plea of *ultra vires* filed by the Western Picture Frame Company, which owned seventy shares of stock in the West Side Trust and Savings Bank from 1924 to 1928. That company had been organized under the General Corporation act of 1872, and, at the time it was organized, it is conceded that it had no power to hold stock in other corporations. Plaintiffs insist that by virtue of the General Corporation act of 1919, all corporations organized prior thereto were given the right and power to own stock in other corporations, and that the Western Picture Frame Company had the right to buy under that act without amend-

ing its charter. The company denied that it had accepted the power conferred by the 1919 act. Section 138 of the act of 1919 (Cahill Stat. 1931, chap. 32, par. 138) provides that any corporation theretofore organized under the laws of this State "shall be entitled to the rights, privileges, immunities and franchises provided by this act." Section 139 provides that certain coöperative organizations may obtain the benefits of the act by filing with the Secretary of State a written declaration to the effect that the corporation has, by the vote of two-thirds of its shareholders, decided to accept the benefits of the act, but no procedure is prescribed for other corporations to follow in accepting the act, and the coöperative organizations are not required to amend their charters to come under the 1919 statute. Plaintiffs contend that no acceptance of the act is required; that section 6, which empowers corporations organized under the 1919 act to hold, vote, pledge or dispose of the stock of any corporation is self-executing and need not be formally accepted by the corporation. They insist that acts of the legislature become a part of the charter (*City of Danville* v. *Danville Water Co.* 178 Ill. 299) and need not be expressly included therein, any more than the right to sue or be sued should be expressly included. They insist that if the charter did not expressly restrict the corporate power, the power would exist in the corporation. The right to hold stock of other corporations is included in section 6 along with the right to have succession by its corporate name; to sue and be sued in its corporate name; to have and use a common seal and alter the same at pleasure; to have capital stock; to own real estate to the extent there permitted and to borrow money. No reason appears to us why it should be necessary to include any of these powers in the charter before they could be exercised by a corporation. Since no method of accepting the 1919 act was provided, it was intended that it should at once apply to all corporations in this State, and to the coöperative asso-

ciations mentioned in section 139 upon acceptance thereof by them in the manner provided. Defendants point to section 4, sub-section 13, which permits the incorporators to include "any other provisions creating, defining, limiting and regulating the powers of the corporation" in the statement new companies are required to file with the Secretary of State. There is no limitation on the power of the Western Picture Frame Company to hold bank stock contained either in its charter or by-laws, and the 1919 act did not require an amendment of the charter for its acceptance. For these reasons the case of *National Union* v. *Keefe,* 263 Ill. 453, is not in point. There, the class of beneficiaries was restricted by the articles of association (the charter) of a benefit society, and we held that a subsequent amendment of a statute which increased the class of beneficiaries could not increase the class of beneficiaries of the corporation, unless its articles of association were amended. However, that statute plainly indicated an amendment of the charter was required. The 1919 act under discussion changed the public policy of this State and permitted corporations to hold stock of other companies for the first time. It was included in the general powers granted all corporations, and they would have the power to hold stock in the absence of a restriction in their charters. Defendants insist that it is against the public policy of this State to permit a corporation to hold stock of a banking corporation but what we have said shows this point is groundless. The legislature, which is the judge of what is politic for this State, changed its policy by the 1919 Corporation act, and stockholding by corporations was thereby authorized. Another answer to the point that the defendant had not accepted the 1919 act assuming, *arguendo,* that acceptance was necessary, is that the act could be accepted by user, where no other method was prescribed, (*Illinois River Railroad Co.* v. *Zimmer,* 20 Ill. 654,) and purchase of the stock would operate as an acceptance of the power conferred in that regard by

the 1919 act. The decree should have held the Western Picture Frame Company liable on 70 shares of stock.

Certain other defendants have also appealed from the decree, which ordered them, as executors, to pay in due course of administration of the estates divers sums of money. They claim these estates have been fully administered; that they had been discharged as executors, and that none of these estates had been reopened before they were served with process in this suit. They assert that, as executors, they were *functus officio* and not subject to suit. This precise question has never been presented to this court, but in *Hulburd* v. *Commissioner of Internal Revenue,* 296 U. S. 300, the United States Supreme Court had occasion to determine the Illinois rule as to the status of executors after the estate had been closed and the executors discharged. It examined section 112 of the Administration act of 1872, and previous decisions of this court, and came to the conclusion that an executor who gives proper notice to the heirs, devisees, and creditors and is discharged by the probate court is *functus officio* and can no longer be sued, "in the absence of fraud, accident or mistake." This is a proper interpretation of our laws, and we adopt it as our own. It is to be noted in that case that the estate had been fully administered; there was no question as to late discovered assets not in the original inventory and the executors were discharged before they received notice of the tax assessed against the estate. The plain intent of section 112 of the Administration act is to discharge an administrator or executor at the completion of his duties, and where proper notice is given, an order of discharge is binding on heirs, devisees, and creditors in the absence of fraud, accident or mistake. It was error to hold these executors liable and as to these the decree must be reversed.

Plaintiffs urge that the final stockholders should have been held liable, in equity, for interest from the date suit was filed, and that former stockholders likewise should have

been held liable for interest from the date the audit by Silver was furnished to them November 22, 1935. A great many pages are consumed in "the pot calling the kettle black"—that is, in plaintiffs criticizing defendants and defendants pointing out wherein plaintiffs consumed time and unduly increased the size of the record. The plaintiffs do not rely on a statute to support their contention that interest should have been added to the amounts found due from stockholders. They agree with the rule that equity will allow interest in a proper case although not within the precise terms of the statute. (*Duncan* v. *Dazey,* 318 Ill. 500, 527; *Thompson* v. *Davis,* 297 id. 11; *Golden* v. *Cervenka,* 278 id. at page 409.) In chancery, interest is allowed where its allowance is warranted by equitable considerations. If it does not comport with justice, interest will not be allowed. (*McKay* v. *McCoid,* 298 Ill. 566, 572.) The principal claim of plaintiffs is that defendants were guilty of vexatious delay. The mere fact of appearing and defending a suit is not considered such delay. (*Imperial Hotel Co.* v. *Claflin Co.* 175 Ill. 119.) There is no claim of fraud in this case as a reason for the allowance of interest but plaintiffs say that final stockholders knew at all times that the liabilities which accrued during their ownership far outran the par value of their stock and, therefore, they should have paid when sued. Some contentions were made that stockholders were not entitled to have the fourteen per cent dividend taken into account to reduce the general liabilities. Some plaintiffs also contended no credits or offsets should be allowed if proved, and some slight errors were shown to exist in the audit by Silver.

We have already held that defendants were correct in their contention that payments by stockholders before the decree should have been applied to reduce all liabilities in their periods of ownership and that it was error to apply them to the reduction of liabilities accruing in a particular part of the period. The fourteen per cent dividend was

finally used to reduce all the liabilities and the Kadish audit showed the credits and set-offs that should have been and were used to reduce still further the particular liabilities to which they applied. We cannot hold in one breath that defendants have shown that errors were committed and in the next breath say they were guilty of vexatious delay in defending the suit against them until their rights were properly adjudicated.

In *Munger* v. *Jacobson,* 99 Ill. 349, this court held interest was not recoverable against a stockholder in an action under section 3 of the charter of the Bank of Chicago to recover a superadded liability in favor of creditors of that bank. The case did not involve the construction of the 1870 constitution but it is in line with the general policy of the courts of this State not to allow interest except where there is a statutory provision for it or justice and equity in a chancery suit, require its allowance. This contention of the plaintiffs is overruled.

Plaintiffs contend the chancellor erred in failing to pass upon the question of costs. This question has been waived.

We need not extend this opinion by considering whether plaintiffs released errors; whether they properly filed their cross-appeal instead of appealing separately, or whether they were compelled to compromise their claims in violation of the due process clauses of the State and Federal constitutions.

The decree of the superior court is affirmed with the exceptions noted in this opinion. As to those points, it is reversed, and the cause is remanded for further proceedings consistent with the views herein expressed.

*Affirmed, in part, and reversed, in part, and remanded.*

Mr. Justice Shaw, dissenting.