HOMER A. BONHIVER, Plaintiff-Appellee, *v.* STATE BANK OF CLEARING, Defendant-Appellant.—(JAMES BAYLOR, Director of Insurance, Intervenor-Appellant.)

(No. 55884; ▮▮▮▮▮▮▮)

First District (3rd Division)—June 5, 1975.

*Rehearing denied July 17, 1975.*

Sundheim, Morgan & Sundheim, of Chicago (David A. Stall, of counsel), for appellant State Bank of Clearing.

Leonard M. Ring and Ellis B. Rosenzweig, both of Chicago, for appellant James Baylor.

James B. O'Shaughnessy and Martha M. Jenkins, both of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Homer A. Bonhiver (Bonhiver), as the Minnesota court receiver of American Allied Insurance Company, a Minnesota corporation (American Allied), filed a fourth amended complaint which sought to impress a constructive trust as to a certain Time Certificate of Deposit No. 2170 [TCD 2170], issued by defendant State Bank of Clearing, an Illinois banking corporation [State Bank], to "Phillip Kitzer and his nominee or nominees," or to the proceeds of TCD 2170. State Bank filed an

answer and counterclaim which alleged that it rightfully applied the proceeds of TCD 2170 against an outstanding loan due from Phillip Kitzer, Sr. (Kitzer, Sr.). James Baylor (Baylor), as Director of Insurance of the State of Illinois and liquidator for Bell Mutual Casualty Company (Bell Mutual) and Bell Casualty Company (Bell Casualty), both Illinois corporations, was granted leave to intervene, and counterclaimed against plaintiff and all other parties, alleging ownership of TCD 2170 and its proceeds as an asset of Bell Mutual and Bell Casualty. At the conclusion of the evidence presented by all parties the trial judge sitting in chancery entered judgment that Bonhiver is entitled to TCD 2170; that the evidence does not support the claim of Baylor; and that Bonhiver have judgment against State Bank for $100,000 with interest to July 26, 1965, as specified in TCD 2170 and thereafter at the rate provided by law. State Bank and Baylor have filed separate appeals from the judgment entered.

Numerous pleadings were filed by all parties and extensive testimony taken at trial. On the whole, the facts relied upon by each party to support its claim to the proceeds are not disputed. Those facts are as follows:

I. *The Kitzer Empire.* During the time in question Kitzer, Sr. was president and director of four corporations: Bell Mutual, Bell Casualty, American Allied, and the Plymouth Insurance Agency, Inc. (Plymouth), an Illinois corporation. American Allied owned all the stock of Allied Realty of St. Paul, Inc., a Minnesota corporation, which was the sole stockholder of Bell Casualty. American Allied also owned all of the guaranty fund certificates of Bell Mutual. Prior to February 1, 1965, all of the American Allied stock was owned by Kitzer, Sr., and his son Phillip Kitzer, Jr., in joint tenancy. After February 1, 1965, Kitzer, Sr., was the sole stockholder.

In addition, Kitzer, Sr., was president and sole stockholder of United States Mutual Insurance Company of Minnesota, Bell Premium Finance Company of Illinois, Exchange Reinsurance Company of London, England, and of Bell Mutual. He had founded Plymouth which was used as a vehicle for directing insurance business to his other companies. Plymouth was owned by Kitzer, Sr., and Kitzer, Jr., who deposited their personal assets in this agency "to produce money for these companies to operate." Kitzer, Sr., testified that the funds on deposit with the agency were used to incorporate the various other companies that the Kitzers owned and to provide capital to Kitzer, Sr., so that he could secure loans from various banking institutions. He then took the proceeds of these loans, or collateral purchased therewith, and from time to time deposited them with his other companies when they were under investigation by various State departments of insurance.

Kitzer, Sr., testified that brokers' deposits from all the companies were deposited to a Transamerican Agency premium trust account, then transferred to the individual companies. His testimony shows that it was his usual practice to put personal funds into the Plymouth account and withdraw funds from both Plymouth and Transamerican and use those funds alone, or after borrowing additional funds, deposit them with his insurance companies to reflect solvency on the books of those companies to satisfy Minnesota and Illinois Departments of Insurance audits. The procedure was quite simple. Kitzer, Sr., would direct funds from solvent companies into one or the other of the agencies, draw a check on that agency and use it as collateral for a larger loan. The proceeds were sometimes converted into negotiable or nonnegotiable collateral. Nevertheless, the collateral obtained would be transfered to a company which was facing a department of insurance audit and which was either insolvent or close to so being. It was the common practice of Kitzer, Sr., to transfer collateral, however obtained, among his companies whose books evidenced an understatement of capital.

II. *The Transaction.* Some time prior to January of 1965, several checking accounts were maintained at State Bank—one in the name of Phillip Kitzer, Sr., one in the name of Bell Mutual, another in the name of Bell Casualty, and the last one in the name of Bell Premium Finance Company. For some years prior to the time Kitzer, Sr., deposited with and borrowed from the State Bank large sums of money in both his own name and for those companies which had accounts with State Bank. Since 1962 the bank had made various loans to Kitzer which exceeded $4 million and consisted of secured as well as unsecured loans.

On January 25, 1965, Kitzer, Sr., discussed with Paul Bere, vice-president of State Bank, the possibility of making a $300,000 deposit. Bere had had previous dealings with Kitzer since 1962 when the above four accounts were opened. It appears that Kitzer, Sr., was the only person who represented the four companies in the discussions with Bere. At the meeting on January 25, Kitzer, Sr., sought to have State Bank issue three time certificates of deposit each in the amount of $100,000, in his name. He offered to deposit $150,000 into his personal checking account, and sought to borrow the remaining $150,000 from the bank. Bere agreed to the proposal and Kitzer, Sr., deposited to his account at the bank a check of Plymouth Insurance Agency made payable to State Bank. Bere knew that Kitzer was president of Plymouth. The $150,000 loaned to Kitzer, Sr., was evidenced by an unsecured installment note. Both the loan proceeds and the Plymouth check for $150,000 were deposited to Kitzer's personal checking account. Immediately, $300,000 was withdrawn from the account and applied to time deposits evidenced by three time certificates

of deposit, each for $100,000, bearing numbers 2170, 2171 and 2172. Each of the TCDs matured in 6 months from the date of issuance, on July 25, 1965, and each certificate stated on the reverse side that it was non-negotiable. Kitzer, Sr., asked Bere to designate the owner of each certificate as "Phillip Kitzer and his nominee or nominees," and they were so issued. At trial, Kitzer, Sr., testified that the purpose of obtaining the certificates was to enable his Illinois corporations to show larger account balances in an effort to avoid liquidation upon examination by the Illinois Department of Insurance.

Bere testified that although he had met Phillip Kitzer, Jr., he had dealt almost exclusively with Kitzer, Sr. He further stated that Phillip Kitzer, Sr., was designated on the bank records as either Phillip Kitzer or Phillip Kitzer, Sr.

III. *Claim of Homer Bonhiver.* In the fall of 1964 the Minnesota Department of Insurance commenced an examination of the financial affairs of American Allied to ascertain the financial status of the company as of December 31, 1964. The examination continued through the spring of 1965 until June 11, 1965, when the Minnesota Insurance Commissioner, acting upon the May 26, 1965, and June 8, 1965, reports of the examiners, commenced proceedings against American Allied in the Minnesota courts. It was requested that a Minnesota receiver be appointed to liquidate American Allied's assets for the reason that the company had a deficit balance in excess of $1 million, and that no evidence was presented by company officials after demand of any intention to provide additional funds to stabilize the company.

Bonhiver was appointed to act as receiver for American Allied on August 4, 1965. After taking possession of American Allied's offices he found documents which purportedly evidenced the transfer of all three certificates of American Allied together with an assignment of the three certificates dated January 27, 1965, which appointed American Allied as nominee. At trial Bonhiver testified that Kitzer, Jr., actually signed the assignment. Kitzer, Sr., testified that his son informed him by telephone of the assignment and that he protested that Kitzer, Jr., had no right to assign the certificates. Bonhiver found TCD 2170 among American Allied's documents after having taken possession of their business offices.

Kitzer, Sr., testified that TCD 2170 was always in his possession and never in Minnesota until Peter Rugani took it to American Allied and "let that certificate lay." Kitzer, Sr., wishing to sell American Allied to the Ohio insurance company owned by Rugani, gave him the certificate as part of the closing transaction. He further testified that the certificate was never in Minnesota prior to July 7, 1965, when it was taken there to close the sale of American Allied; that Rugani, under threat of a Federal

indictment, did not close the transaction, left the certificate in Minnesota and returned to Pittsburgh.

At trial Kitzer, Sr., testified that although he was president of American Allied, Kitzer, Jr., was "running the company" and whatever his son did was all right with him. On cross-examination he denied that in January of 1965 certificates 2170 and 2171 were transferred to American Allied to replace $200,000 worth of United States Government bonds which had been taken previously by Kitzer, Sr. Plaintiff's Exhibit 4, identified as being "Adjusting General Entries" of American Allied (a handwritten work sheet containing penciled notations) was introduced into evidence. Bonhiver testified that this document, prepared in the usual course of business by Graf, the company accountant, purported to show the transfer of TCD 2170 as a replacement for the government bonds. Bonhiver further testified that the entries on the work sheet corresponded with the computerized printout of American Allied's assets and liabilities. Kitzer, Sr., admitted that the assignment of TCD 2170 and TCD 2171 may have been recorded on American Allied's books pursuant to his son's direction, but denied both that the company had possession of those certificates prior to July 7, 1965, and that his son had authority to assign them. Kitzer, Sr., further testified that on December 7, 1964, he purchased $502,500 worth of government bonds and delivered them to American Allied to make up part of the company's balance sheet deficit.

IV. *Claim of James Baylor.* The pertinent testimony adduced at trial relative to the claim of Baylor follows: In February 1965, Kenneth Bell, an accountant in charge of the books of Bell Mutual, questioned Kitzer, Sr., concerning a check in the amount of $100,000 drawn on the Bell Mutual account by Kitzer and payable to Plymouth. Kitzer, Sr., advised him that those funds had been used to purchase TCD 2170 as an asset of Bell Mutual. Bell prepared an instrument, dated February 23, 1965, stating that TCD 2170 "was incorrectly issued in the name of Phillip Kitzer and is really the property of Bell Mutual Casualty Company." Kitzer signed it and Bell witnessed the signature. TCD 2170 was then entered and recorded in the books of Bell Mutual as its asset. Bell presumed that Kitzer had the certificate in his possession at that time. Bell then prepared a summary of assets of Bell Mutual for purposes of an Illinois Department of Insurance examination. On May 14, 1965, an inventory of Bell Mutual's assets in the safety deposit box at Exchange National Bank of Chicago, at which Kitzer, Sr., was present, revealed the presence of TCD 2170. In response to the question of a State examiner concerning the name appearing on TCD 2170, Kitzer replied that it had been incorrectly issued, that he had tried to get it changed, but to do so would entail the loss of several months' interest, and that he would get

it changed when it came due. He then exhibited the February 23, 1965, instrument to the examiner as proof of Bell Mutual's ownership of TCD 2170.

Only Kitzer, Sr., and his son had access to the safety deposit box at Exchange National in which the securities and other assets of Bell Mutual were held. Late in May 1965, Kitzer, Sr., advised the Illinois Department of Insurance that everything in Minnesota was "blowing up" and that he feared the State of Minnesota would confiscate the assets of Bell Mutual. Refusing to disclose the present whereabouts of those assets, he advised the Department that he had removed them and had them in a safe place. In June of 1965 a second physical inspection of the safety deposit box confirmed that all of the assets had been removed.

V. *Claim of State Bank of Clearing.* Subsequent to the purchase of TCDs 2170, 2171 and 2172, Kitzer, Sr., on March 3, 1965, pledged TCD 2172 to the State Bank as security for another $100,000 loan which was evidenced by the execution of a collateral note due July 25, 1965. On May 24, 1965, Kitzer, Sr., executed a $72,000 collateral note to State Bank, also due July 25, 1965, in which he pledged TCD 2171. The above TCDs were delivered to State Bank on the respective dates of the collateral notes.

Bere testified that 2 or 3 weeks prior to the maturity date of the TCDs, Kitzer, Sr., personally advised him that he was having difficulty with his companies and was presently negotiating the sale of American Allied. Kitzer, Sr., told Bere to pay off his loans with the proceeds of the TCDs when they came due. He advised Bere about the first of July 1965 that he wanted TCD 2170 applied against the balance of $100,000 still due on his $150,000 unsecured loan when it became due. Bere testified at trial that Kitzer, Sr., had told him he had the certificate. Bere's prior deposition was read into the record. In it he had stated that Kitzer told him he did not have the certificate and that a prospective purchaser from Pennsylvania had it. Bere later stated that Kitzer told him that TCD 2170 was at his lawyer's office among papers to be involved in the sale of American Allied. Bere testified that he did not inquire whether that certificate was part of American Allied's assets and that Kitzer did not explain why the certificate was involved in the transaction. Bere further testified that several requests were made of Kitzer to produce the certificate, and that each time Kitzer said he would try to bring it in.

All of Kitzer's loans and the maturity date of the TCDs fell on Sunday, July 25, 1965. Bere testified that it was the regular practice of State Bank to close its books at 3:00 P.M. on Friday and reopen at 4:30 P.M. the same day. All business transacted on Friday evening, after 4:30 P.M., is dated as of the following Monday. Some time after 4:30 P.M. on Friday,

July 23, 1965, Bere instructed the State Bank's cashier to set off the Kitzer deposits [represented by the TCDs] against his outstanding loans. TCDs 2171 and 2172 were applied against the March and May 1965 loan balances. TCD 2170 was applied against the $100,000 balance of Kitzer's original unsecured loan of $150,000. Bere, notwithstanding the above actions, testified that when a loan becomes due on Sunday, the borrower has the opportunity to pay off the balance by the end of the next business day.

VI. *Facts Precipitating the Instant Litigation.* On July 13, 1965, the Illinois Department of Insurance sent a letter to State Bank and also informed the Bank by telephone that claim was being made to TCD 2170 as the property of Bell Mutual. On July 22, 1965, a letter was sent by a representative of the Minnesota Director of Insurance to State Bank claiming the proceeds of one or more of the TCDs in the name of Phillip Kitzer, along with a claim to other assets in the name of Phillip Kitzer held by State Bank. On July 23, 1965, Bere received a telephone call from Kenneth Fitzpatrick of the Minnesota Department of Insurance claiming ownership of Kitzer's funds at the bank on behalf of American Allied.

On July 24, 1965, the instant proceedings were commenced by the State of Minnesota as plaintiff, on which date a temporary injunction was granted by the Circuit Court of Cook County restraining State Bank from transferring any of Kitzer's funds on deposit. The writ of injunction was served on State Bank on Monday, July 26, 1965, approximately 30 minutes after the bank had opened for business. However, by that time the bank had already made the bookkeeping entries to set off the proceeds of TCD 2170 against the balance of Kitzer's outstanding unsecured loan.

Subsequently, on September 16, 1965, leave was granted to Bonhiver as the Minnesota Receiver for American Allied to substitute as plaintiff in place of the State of Minnesota and to file an amended complaint. The Illinois Director of Insurance was granted leave to intervene and assert its claim to the TCDs.

In the trial court and in this appeal Bonhiver and Baylor have asserted no claims to TCDs 2171 and 2172. However, Baylor maintains that TCD 2170 is an asset of Bell Mutual inasmuch as Bell Mutual's funds were used to purchase it. Bonhiver, on the other hand, contends that TCD 2170 is an asset of American Allied, and relies upon the assignment of that certificate by Kitzer, Jr., to American Allied. State Bank maintains that it properly applied the proceeds of TCD 2170 against the balance due on the unsecured loan to Kitzer, Sr., and that its right to do so is superior to the claims of both Bonhiver and Baylor.

VII. *Opinion.* The trial court, in the judgment entered on December 17, 1970, in summary held that the assignment of TCD 2170 by Phillip

Kitzer, Jr., was ratified by Kitzer, Sr.; that the records of American Allied showed that TCD 2170 was an asset of that company; and that State Bank wrongfully applied the proceeds of TCD 2170 against the indebtedness owed by Kitzer, Sr. The court further held that the evidence did not support the claim of Baylor that Bell Mutual was the owner of the certificate.

The claim of Bonhiver to TCD 2170 is based upon the following: (1) possession of the certificate among the records of American Allied; (2) the written assignment of the certificate—not by Kitzer, Sr., but by Kitzer, Jr., on January 27, 1965; (3) the alleged ratification of this assignment by the "inaction" of Kitzer, Sr., after knowledge thereof; and (4) the books and records of American Allied which showed the TCD was an asset of American Allied.

At the trial Bonhiver proceeded upon the theory that the "assignment" to American Allied was executed by Phillip Kitzer, Sr. However, after Bonhiver rested his case, a handwriting expert testified that the person who executed the alleged assignment was not Kitzer, Sr. Bonhiver was permitted to reopen his case in chief and testified that he knew it was the son's signature which appeared on the assignment (the document bore the signature "Phillip Kitzer" with no designation as to Jr. or Sr.), and that Kitzer, Jr., testified in an unrelated criminal proceeding in Minnesota that he had signed the document as his own signature and not on behalf of someone else. Kitzer, Sr., testified that he talked to his son soon after the acquisition of the TCDs. Kitzer, Jr., advised his father that he had executed an assignment of the certificates to American Allied. Kitzer, Sr., advised his son that he had no authority to make any assignment to American Allied and that he should not consider the TCDs as assets of American Allied. He further testified that he had possession of TCD 2170 in Illinois until it was taken to Minnesota by Rugani. Testimony was elicited at trial that TCD 2170 was in the safety deposit box of Bell Mutual in May 1965, and there was further evidence that Kitzer, Sr., had executed a document stating that Bell Mutual was the actual owner of the certificate in February 1965. The fact that the certificate was found among the papers of American Allied is not inconsistent with the explanation given by Kitzer, Sr., as to how it got there.

■■ The issuance of a time certificate of deposit creates the relationship of debtor and creditor between the bank and the depositor. (See *People ex rel. Nelson v. Sheridan Trust & Savings Bank* (1934), 358 Ill. 290, 193 N.E. 186; *Heiple v. Lehman* (1933), 272 Ill.App. 513.) A certificate of deposit has been held to be in the nature of a general deposit with a bank which is payable on demand when properly endorsed. (*Emerson v. North American Transportation and Trading Co.* (1922),

303 Ill. 282, 135 N.E. 497.) However, a time certificate of deposit has been held to be in the nature of a promissory note. (See *Laughlin v. Marshall* (1857), 19 Ill. 390; and *Bank of Montreal v. Clark* (1903), 108 Ill.App. 163.) The latter classification of these deposits is consistent with debtor-creditor relationship established by any deposit and the terms generally found in time certificates of deposit. The depositor transfers a specific sum of money to the bank in return for the bank's promise to pay him, after the expiration of a fixed period of time, the original sum deposited plus interest at a set rate. Although Bonhiver and the State Bank disagree as to whether the instant certificate was negotiable, the issue is whether or not the certificate in question, which states specifically that it is *not* negotiable, is transferable by assignment.

■■■ It is our opinion that a time certificate of deposit is transferable by assignment. (See *State Bank v. Central Mercantile Bank* (1928), 248 N.Y. 428, 162 N.E. 475.) The bank's obligation is to pay the payee or assignee, and the assignee stands in no better position than his assignor when demand for payment is made. (*People's Sav. Bank v. Smith* (1930), 210 Iowa 136, 230 N.W. 565.) The courts of this State have often held that an assignment of a promissory note may not be effected through a separate instrument. (*Barrett v. Hinckley* (1888), 124 Ill. 32, 14 N.E. 863; *Bouton v. Cameron* (1903), 205 Ill. 50, 68 N.E. 800.) And the legislature has provided specifically that promissory notes shall be assignable "by endorsement thereon." Ill. Rev. Stat. 1971, ch. 98, pars. 1 and 2.

■■ In the case before us, however, the purported assignment was by separate instrument. For this reason alone it was ineffective as an assignment of TCD 2170 to American Allied. Furthermore, we add that the evidence adduced at trial is insufficient to establish ratification by Kitzer, Sr., of his son's action. For these reasons we conclude and hold that American Allied acquired no interest in TCD 2170 through the purported assignment and that the trial court erred in granting Bonhiver a judgment for the proceeds of that certificate. It is therefore unnecessary to discuss the remaining arguments raised with respect to Bonhiver's claim.

State Bank, on the other hand, claims ownership of the proceeds of TCD 2170 through its right to set off claims it has against Kitzer, Sr. The bank further argues that its right of setoff existed at the time the TCDs were issued and that the concurrent maturity dates of the TCDs and the unsecured loan to Kitzer, Sr., of $150,000 evidence a singular transaction which "immediately gave rise to an inchoate lien of the Bank on this deposit with the Bank having setoff rights available upon the maturity dates of both instruments."

■■ Notwithstanding the authority cited to us by the bank, it has been held that a bank has the power to apply the deposit to the payment of

such depositor's indebtedness only when there are mutual demands and debts between the parties. (*Heiple v. Lehman* (1933), 272 Ill.App. 513, 520.) Such a right is not a lien, inchoate or otherwise, for the simple reason that one cannot have a lien on his own property. (*Heiple.*) The right of setoff arises at the time the depositor's indebtedness to the bank has matured. (See *Elzy v. Morrison* (1913), 180 Ill.App. 711, 715; *Faber, Coe & Gregg, Inc. v. First National Bank* (1969), 107 Ill.App.2d 204, 208, 246 N.E.2d 96.) The fact that the certificates were issued on the same date the loan was made, and that all four instruments bore the same maturity dates, does not add any weight to the bank's argument that it possessed an inchoate lien on the deposits evidenced by the TCD. The loan of $150,000 to Kitzer, Sr., was not secured by the certificates. There is no evidence that the bank required Kitzer, Sr., to deposit the proceeds of the loan with the bank. To the contrary, Bere testified that Kitzer, Sr., requested that the TCDs be issued to him and that Bere complied by inserting on the certificate in his own handwriting the words "Phillip Kitzer and his nominee or nominees." He further testified that the bank had loaned Kitzer, Sr., in excess of $4 million since 1962, which consisted of both secured and unsecured loans.

■■■ A bank cannot withhold payment of a fund on deposit with it on the ground that it holds a note which will mature at some future date. (*Elzy v. Morrison.*) It has also been stated that as a general rule "a bank cannot apply the deposits of a debtor to an unmatured indebtedness in the absence of express authority so to do." (*Faber, Coe & Gregg, Inc. v. First National Bank* (1969), 107 Ill.App.2d 204, 209, 246 N.E.2d 96.) In the instant case Bere testified that a few weeks prior to the maturity date of the loans and certificates Kitzer, Sr., advised him to apply the proceeds of the certificates to the balances due on the loans when they became due. The maturity date of each of these instruments was Sunday, July 25, 1965. Bere testified that it was the custom of State Bank to allow debtors to pay off existing loans under these circumstances by the end of the following business day. Furthermore, all notes or other evidence of indebtedness falling due on Sunday are by law deemed due or maturing upon the day following. (Ill. Rev. Stat. 1969, ch. 98, par. 18.) Therefore, the loans were not due until the end of the business day on Monday, July 26, 1965. State Bank had no claims against Kitzer, Sr., until the end of Monday's business day. (See *Heiple v. Lehman* (1933), 272 Ill.App. 513, 520.) However, after the close of Friday's business day, State Bank made the necessary bookkeeping entries to set off loans due from Kitzer, Sr., with the proceeds of the certificates. Notwithstanding the above statement in *Faber,* the bank did not have the right to apply the proceeds of the certificates against balances due on the loans. The time certificate of

deposit was redeemable and the bank's obligation to pay was fixed "six months after date hereof, or at any subsequent maturity date hereinafter provided." Kitzer, Sr., had no claim against the bank for the proceeds of the certificates until Monday, July 26, 1965; and the bank, regardless of Kitzer's prior direction to apply the proceeds, could not set off the funds on deposit until they became payable to Kitzer. According to the terms of the certificate, the bank's obligation to pay was further conditioned "upon return of this certificate of deposit properly endorsed." However, Kitzer never delivered TCD 2170 properly endorsed to State Bank, and the bank therefore had no power to apply the proceeds of the certificate against the loan when it did so on Friday, July 23, 1965.

In *Kamfner v. Auburn Park Trust & Savings Bank* (1931), 344 Ill. 200, 176 N.E. 363, the court held that the plaintiff could not recover from the defendant bank funds which were deposited in the individual name of the bank's depositor and subsequently used to set off a loan due the bank from the depositor. There, one Halberg received a sum of money from plaintiff to purchase land for the latter. Halberg deposited the fund in his son's account with the defendant bank. He had the right to deposit funds and make withdrawals on the account. The bank refused payment of a check drawn on the account for the reason that Halberg owed the bank money on a past-due loan. The court cited at page 206:

> " 'The decided weight of authority is to the effect that where the bank in which funds in which third persons have an interest are deposited in the individual name of the depositor, has neither actual knowledge nor notice of facts sufficient to put it upon inquiry as to the true character of the deposit, it may apply the deposit to the individual debt of the depositor.' " (344 Ill. 200, 206, Annot., 13 A.L.R. 324, 327 (1921).)

The same general rule was reiterated in *Kerner v. Kinsey* (1943), 384 Ill. 180, 51 N.E.2d 126. These cases, however, are distinguishable. In both *Kamfner* and *Kerner* the defendant banks had set off the funds on deposit against outstanding loans due and payable, and there were no facts in either case sufficient to put the bank on inquiry as to the true character of the deposit.

In the case before us, however, Kitzer made payable to the bank a check drawn upon the business account of Plymouth Insurance Agency in securing issuance of the certificates made payable to "Phillip Kitzer and his nominee or nominees." Kitzer did not return TCD 2170 to Bere; instead, he stated that the certificate was in the possession of his attorney and was involved in the sale of American Allied. These facts alone should have put the bank on inquiry as to the true character of the deposit. These facts created, at the least, circumstances compelling inquiry as to the nature of

the deposit. See *Union Stock Yards National Bank v. Gillespie* (1890), 137 U.S. 411, 34 L.Ed. 724, 11 S.Ct. 118.

We are faced here with the situation of two parties claiming title to funds on deposit. The bank's claim, however, is only to Kitzer's assets generally, or so much of them as necessary to reimburse it for the amount loaned to Kitzer. The Director's claim is to the specific fund on deposit. Kenneth Bell testified—and Kitzer admitted—to the execution of an instrument stating in effect that TCD 2170 was incorrectly issued in the name of Phillip Kitzer and was really the property of Bell Mutual. A $100,000 check of Bell Mutual was deposited by Kitzer to the Plymouth account. That sum and additional funds in the Plymouth account were subsequently drawn and made payable to State Bank.

■■ In *Bartlett v. First National Bank* (1910), 247 Ill. 490, 93 N.E. 337, our supreme court held:

> "When one of two innocent parties must suffer loss by reason of the wrongful acts of a third party, the rule is almost universal that the party who has made it possible, by reason of his negligence, for the third party to commit the wrong must stand the loss." (247 Ill. 490, 498.)

In the instant case the facts are sufficient to show that TCD 2170 was purchased with funds belonging to Bell Mutual. The fact that the $100,000 of Bell Mutual was mingled with the funds of Kitzer in the Plymouth account is of no consequence as the evidence indicates that the Bell Mutual funds were used to purchase TCD 2170. (See *Live Stock Exchange Inc., v. State Bank of Roseville* (1928), 249 Ill.App. 44, 49.) There is no evidence that State Bank when loaning Kitzer the $150,000 changed its position as a result of or on the faith of the deposit. See *National Indemnity Co. v. Spring Branch State Bank* (1961), 162 Tex. 521, 348 S.W. 2d 528.

We therefore conclude and hold that Bell Mutual is the sole owner of TCD 2170 and entitled to the proceeds thereof; that neither Bonhiver nor American Allied has any right or claim thereto; that State Bank is not entitled to retain the proceeds of TCD 2170 and wrongfully applied such proceeds to Kitzer, Sr.'s indebtedness to the bank; and that James Baylor, as Director of Insurance of the State of Illinois and Liquidator for Bell Mutual Casualty Company, is entitled to have and recover from State Bank of Clearing by reason of TCD 2170 the following:

| | |
|---|---|
| Principal amount of deposit | $ 100,000.00 |
| Interest at 3½ per annum from 1/25/65 to 7/26/65 as provided in TCD 2170 | 1,750.00 |
| | $ 101,750.00 |

Interest on $101,750.00 at
5% per annum from 7/26/
65 to 6/5/75 as provided
by Ill. Rev. Stat. 1969, ch.
74, par. 2 ............................................. 50,168.40

Total due as of 6/5/75 ........................ $ 151,918.40

For the foregoing reasons, the judgment entered by the circuit court of Cook County on December 17, 1970, in favor of Homer Bonhiver, plaintiff, against State Bank of Clearing for $100,000, with interest from January 27, 1965, to July 26, 1965, as specified in the certificate of deposit, and thereafter at the rate of interest provided by law and the costs therein, is reversed. In accordance with Supreme Court Rule 366(a)(5) (Ill. Rev. Stat. 1973, ch. 110A, par. 366(a)(5)) judgment is here entered in favor of intervenor, James Baylor, as Director of Insurance of the State of Illinois and Liquidator for Bell Mutual Casualty Company, against defendant, State Bank of Clearing, for $151,918.40 and costs.

Reversed, with judgment.

McGLOON, P. J., and McNAMARA, J., concur.