**LIBERTY SAVINGS ASSOCIATION,**
**Plaintiff-Appellee,**

v.

**SUN BANK OF JACKSONVILLE,**
**Defendant-Appellant.**

**No. 76–2266.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1977.

Decided March 27, 1978.

---

**592**

David C. Roston, Chicago, Ill., for defendant-appellant.

Donald E. Tolva, Thomas B. Cassidy, Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

The apparent villains in this case are, so far as we can tell, fugitives from justice, thought to be in Costa Rica. Needless to say, they are not parties. The two banks which are, Liberty Savings Association (Liberty)[1] and Sun Bank of Jacksonville (Sun), were the honest businesses that were taken, and their classic legal dispute over a fund the villains left behind is now before this court.

Liberty's complaint invokes the diversity jurisdiction of the district court and seeks a declaratory judgment that Liberty's claim to twenty-one $2000 savings accounts established with it by Capital Title and Trust Company (Capital), the company of which the villains were principals, is superior to Sun's claim to the accounts. The complaint alleges that in February 1974, Liberty purchased twenty-one secondary real estate mortgage loans pursuant to an agreement with Capital that Capital would establish the $2000 accounts to secure the loans. It also alleges that in April 1974 Sun requested from Liberty approval of an assignment to it by Capital of the accounts to secure a loan made by it to Capital, and that Liberty gave its approval conditioned upon the priority of its claim to the accounts.

In its answer and counterclaim, Sun alleges that it loaned $40,000 to Capital on April 23, 1974, receiving as security an assignment of the twenty-one accounts and possession of the passbooks evidencing the accounts. Sun alleges that it entered this transaction without any notice of any claim by Liberty, and, indeed, the passbooks Sun received bear no indications of any limitation on transferability or any claim of Lib-

---

1. Foster Savings & Loan Association was merged into Liberty prior to the commencement of this action but subsequent to the events which gave rise to the action. Although Foster was the actual actor in these events, we refer herein to Foster and Liberty jointly as Liberty for convenience.

erty.[2] Sun admits that it sent Liberty a form document entitled "Request for Approval of Assignment" to advise and give notice to Liberty of its interest in the accounts. The counterclaim also sets out Capital's default on its loan from Sun and demands payment from Liberty of the proceeds of the accounts, plus accrued dividends, interest, and costs.

Both parties moved for summary judgment. The district court granted summary judgment in Liberty's favor, giving particular significance to the Request for Approval form, and certain language therein. Notably, the form states that the account passbooks had been tendered and were being "held by us for safekeeping subject to your approval." Also, the portion of the form signed by the assignor (Capital) says, "This assignment is acknowledged and approved by the undersigned account holder(s), subject to approval of the Association." Finally, the form has a printed section to be signed by the association to which the form is sent, which begins by stating, "This Association hereby approves the above requested assignment . . . ." (It was to this last section that Liberty added the typed language conditioning its approval on the priority of its claims to the accounts.)

The district court reasoned that with this "clear language" Sun "conditioned the validity of Capital's assignment upon approval by [Liberty] . . . ." Accordingly, Sun either accepted the conditional approval by Liberty, thus subordinating its claims, or, if it rejected the conditions of Liberty's approval, then it has no claims at all, "since the assignment by Capital to Sun Bank was specifically made subject to [Liberty's] approval . . . ." On appeal, Liberty defends the judgment on the same grounds, arguing that the sole issue in the case is whether Sun subordinated its claims (or has none at all by reason of rejecting Liberty's conditional approval) and that this issue is "controlled simply and exclusively" by the terms of the Request for Approval form, as modified by Liberty.

■ We cannot accept the underlying premise of the theory advanced to sustain the judgment, that when Sun and Capital executed their loan agreement on April 23, 1974, it was intended by them that the assignment of accounts which secured the loan be contingent on Liberty's approval thereof. Surely the law required no such approval. The Illinois Savings and Loan Act specifically provides that:

> [t]he holder of a withdrawable capital account may transfer his rights therein absolutely or conditionally to any other person eligible to hold the same, by written assignment accompanied by delivery of the appropriate certificate or account book . . . . .

Ill.Rev.Stat.1975, ch. 32, § 768(b). The same section provides that even though such an assignment be effective between the parties, the savings association may treat the account holder of record as the account owner for various purposes until procedures for transferring record ownership are undertaken. By necessary implication, no approval by or even notice to the association is required to effect the assignment.[3]

We see no reason to conclude that Sun and Capital intended to condition their assignment on an event not required by law. Strangely, after arguing, to justify its re-

2. The passbooks do contain typical language to the effect that the accounts were established subject to the rules and bylaws of Liberty, but in response to interrogatories, Liberty has disclaimed any reliance on any such rules in this case.

3. Although the assignment took place in Florida, Illinois conflicts law, which governs this diversity action brought in district court in Illinois, provides that the assignability of a contract right (as the savings accounts here) is determined by reference to the law of the place where the underlying contract was made, *i. e.*, in this case, Illinois. *Coleman v. American Sheet & Tin Plate Co.*, 285 Ill.App. 542, 2 N.E.2d 349, 352 (1936). Moreover, Florida's analog to the Illinois statute quoted above, Fla. Stat.Anno. § 665.231(1) (1976 Supp.), is part of a comprehensive code governing the affairs of *Florida*-chartered savings and loan institutions, and could not by any stretch of the imagination be applied to an account in an Illinois association.

liance on the Request for Approval form as indicative of the intended nature of the assignment, that documents executed together as part of the same transaction must be construed together, Liberty gives extremely short shrift to the language contained in the "Note" and the "Assignment" executed on April 23. The Note refers to a previously or contemporaneously executed pledge or assignment of the accounts, and the Assignment expressly, completely, and immediately purports to assign all of Capital's interest in the accounts[4] to Sun. Neither document contains any indication that there was anything conditional about it.

In this context, the import of the "approval" language in the Request for Approval form appears much less clear than it might have if that document constituted the entire agreement between Sun and Capital. We cannot know from the record before us exactly what the parties intended the approval language to mean. The form asks Liberty to credit dividends directly to the accounts, and the approval sought may have been to that procedure. Perhaps more likely, the form's language may have been designed to refer to the fact that transfers of formal interests in accounts on Florida savings and loan associations must be on the books of the associations, and the associations have a right to approve the transferees as members. Fla.Stat.Anno. § 665.-231(1) (1976 Supp.).[5] Viewed in this light, the form could, as Sun asserts, have been sent to Liberty just to give notice and give the directions referred to above. While, as we have said, we cannot be positive what Sun and Capital did intend the form to mean, the undisputed facts do allow the firm conviction they did *not* intend their transactions to be dependent on Liberty's approval.

The parties' conduct sheds the determinative light in this regard. For obvious reasons, Liberty strenuously objects to any consideration of matters outside the "four corners" of the documents executed by Sun and Capital. Illinois' parol evidence rule, which applies here, *see* 1A–2 Moore's Federal Practice ¶ 0.313 at 3502–04 (2d ed. 1977), is not that strict. The very case cited by Liberty for the proposition that the Request for Approval form must be construed as part of the contract in question demonstrates the point in the sentence immediately following the one Liberty quotes:

> Courts in the construction of contracts, look to the subject matter, the language employed and the surrounding circumstances. They are not excluded from the light which the parties enjoyed when the contract was executed. . . . In case of doubt, the interpretation which the parties by their acts under the contract have given it, will have weight, and may be controlling, provided the plain terms of the agreement are not overthrown. [Citations omitted.]

*Nelson v. Colegrove and Co. State Bank*, 354 Ill. 408, 413, 188 N.E. 461 (1933). *See also Ortman v. Stanray Corporation*, 437 F.2d 231 (7th Cir. 1971); *International Minerals and Chemical Corporation v. Husky Oil Company*, 485 F.2d 153, 158–60 (7th Cir. 1973).

In this case, undisputed evidence outside the four corners is quite persuasive that Sun and Capital intended and effected a complete assignment on April 23, 1974. Sun's officer who approved the loan to Capital testified in his deposition that the security of Capital's collateral (the accounts) was an important factor in his approval of the otherwise unsecured loan. That would naturally be true. Yet Sun credited Capital's account with the loan proceeds on the same day the documents were executed, and Capital withdrew most of the funds within a few days and the balance soon thereafter. This conduct is totally inconsistent with the notion that the parties intended their assignment agreement to be conditional on Liberty's approval. The im-

---

4. A typographical error indicated that the assigned accounts were with Sun, but neither party contests that the assignment intended was of Capital's accounts with Liberty.

5. Even so, once a Florida savings and loan has received and acknowledged notice of a pledge of one of its accounts, it is no longer free to treat the record owner as the true owner. *Id.*

portance of the collateral to Sun makes it inconceivable Sun disbursed funds with the intention that Liberty might, for whatever reason, render the collateral valueless by refusing approval. Capital's quick withdrawal of the funds indicates its intention to consummate the loan agreement immediately and its understanding that there was nothing conditional about the transaction.

This being true, the district court's conclusion that Liberty's unilateral addition of subordination language to the Request for Approval had dispositive effect on Sun is unacceptable. The district court should have granted summary judgment not to Liberty but to Sun, on Liberty's complaint.

We reach the same conclusion with reference to Sun's counterclaim, which demanded payment of the funds in the account. An account book is prima facie evidence of a financial institution's liability to pay the amount indicated therein. *Bugdoian v. Union Trust Company of East St. Louis*, 337 Ill.App. 405, 413, 86 N.E.2d 253 (1949). Sun put before the district court account books representing $42,000 in deposits and an apparently valid assignment agreement with the original depositor, Capital. To defeat the prima facie case thus made, Liberty was obliged to offer affidavits, depositions, interrogatories, or the like, which could establish at least the existence of material disputed facts. *See* Fed.R.Civ.P. 56(e). With the exception of some materials tending to support the subordination theory which we have rejected *supra*, Liberty failed to offer such materials. No attack has been made on the accuracy of the account book entries, or, except as we have noted, on the validity of the assignment.

Liberty might have defended against the counterclaim on the theory it had a right of setoff to apply Capital's deposits to the payment of Capital's matured debts. This theory was not pled, the rubric of Liberty's pleadings being in terms

of a lien it allegedly had on the accounts. But a bank deposit does not create a specific fund with the depositor's name on it. The funds deposited become the bank's, and a liability in favor of the depositor is created. One does not have a lien on one's own property. *Bonhiver v. State Bank of Clearing*, 29 Ill.App.3d 794, 331 N.E.2d 390, 398 (1975). Preferring not to hoist Liberty on the petard of a poorly articulated legal theory, we address briefly the possibility that Liberty has put enough into the record to demonstrate a disputed factual issue on a setoff defense. We think not, for two reasons.

First, as surprising as it may seem, Liberty failed to put anything before the district court which established the existence of a debt in its favor with Capital that could be set off. Liberty's assertion at oral argument here that it had no idea its debt was in issue in the district court is untenable both because Sun's counterclaim as supported by summary judgment materials established a prima facie case which Liberty had no right to assume the bare allegations of its pleadings could defeat, Fed.R.Civ.P. 56(e), and because in Sun's Memorandum supporting its own and opposing Liberty's summary judgment motion, Sun argued that Liberty had no pledge of the accounts (lacking possession of the account books), had not transferred the accounts on its books, and thus could have no claim that could be superior to Sun's.[6] Furthermore, a debt is not subject to setoff unless it has matured, *Bonhiver, supra,* 331 N.E.2d at 398; not having even demonstrated a debt, Liberty has *a fortiori* failed to establish this critical element of a defense. Even Liberty's complaint, which alleges that Capital's debt was (as of the November 10, 1975 filing date) and had been for some time in default, does not allege default as early as April or May of 1974, by which time Liberty had received notice of Sun's pledge.

---

6. In fact, as early as August 1974, more than a year before the complaint in this case was filed, Sun, in correspondence, challenged the adequacy of documentation provided by Liberty to demonstrate any sort of pledge agreement with Capital.

**596**

A second reason a setoff theory will not be viable, even if there was a matured debt, is that a bank's rights to apply a deposit to a depositor's debt are limited once it has received notice of a third party's interest in the funds on deposit. *See Kamfner v. Auburn Park Trust and Savings Bank*, 344 Ill. 200, 206, 176 N.E. 363 (1931); *Kerner v. Kinsey*, 384 Ill. 180, 51 N.E.2d 126 (1943); *Bonhiver, supra*, 331 N.E.2d at 399. There is nothing at all in the record to indicate any action by Liberty whatsoever prior to receiving notice of Sun's pledge.

Our conclusion that Sun should be granted summary judgment on its counterclaim is supported by the sound and well established rule of Illinois law that

> [w]hen one of two innocent parties suffer loss by reason of the wrongful act or acts of a third party, . . . the party who has made it possible, by reason of his negligence, for the third party to commit the wrong must stand the loss.

*Bartlett v. First National Bank of Chicago*, 247 Ill. 490, 93 N.E. 337 (1910); *Bonhiver, supra*, 331 N.E.2d at 399. There can be no doubt that this rule applies here, for it was Liberty that gave Capital the means to commit the wrong, in the form of prima facie evidence of Liberty's liability for $42,000, totally devoid of any indications on the face thereof that there existed any claim or encumbrance of any sort on the accounts.

For the reasons stated, the judgment of the district court is reversed, and the cause is remanded for entry of summary judgment in Sun's favor, both on Liberty's complaint and Sun's counterclaim.

**REVERSED AND REMANDED.**