TRI STATE BANK OF EAST DUBUQUE, Plaintiff-Appellee, v. BRAD-
FORD L. COLBY *et al.*, Defendants-Appellants.

Second District No. 2—85—0091

Opinion filed March 17, 1986.

Michael A. Stapleton, of East Dubuque, for appellants.

John W. Cox, Jr., of Galena, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Tri State Bank of East Dubuque, brought this action against defendants, Bradford L. Colby and Julia M. Colby, to recover on two notes which were in default. Defendants counterclaimed for the wrongful conversion of their savings account. The trial court granted summary judgment for plaintiff, awarding it $35,847.01 as principal and interest on the two notes. The court also dismissed defendants' counterclaim and awarded plaintiff attorney fees in the amount of $2,100. Defendants then brought this appeal.

The pleadings, depositions and affidavits contained in the record reveal the following. Defendants had been customers of the Tri State Bank for approximately 10 years prior to the events giving rise to this action. Mr. Colby was a truck driver and hauled meat from East Dubuque to the East Coast. On May 13, 1983, defendants executed a note in the amount of $17,488.03, the principal collateral for which was a used 1979 Fruehauf refrigerated trailer. The note was to be paid in 48 monthly installments of $477.33 beginning June 9, 1983. On August 26, 1983, defendants executed a second note for $18,114.68, payable in 36 monthly installments of $623.52 beginning September 25, 1983. The primary collateral for this note was a used 1979 Freightliner tractor. In addition to the collateral previously noted, the security agreement for each note contained the following provision: "To secure payment of this note *** you grant Lender a security interest in and the right to take and apply to this loan any moneys, credits or other property of yours, owing to you by Lender, on deposit or otherwise." The relevant portion of the security agreements regarding default provides as follows:

"You'll be in default:

1. If you don't pay any installment when due on this note or on any other indebtedness to Lender, or

* * *

7. If you fail to comply with the terms of any security agreement, mortgage or trust deed securing this loan.

Lender can then demand immediate payment of the outstand-

ing balance of this note, any earned interest and any other indebtedness of yours to Lender. Lender will also have other legal rights, for instance, the right to repossess, sell and apply security to the payments under this note. The Lender and you shall have all the rights and remedies provided by Article 9 of the Illinois Uniform Commercial Code ***."

The security agreements also contained a provision under which defendants agreed to pay the costs of collection, including attorney fees, in the event of a default.

In late December of 1983, Mr. Colby began experiencing serious mechanical problems with his truck. As a result, the truck was in the shop for repairs much of January, February and March of 1984. It is not disputed that defendants failed to make the monthly payments on the notes for the three months that the truck was undergoing repairs, even though they had approximately $9,300 in a savings account at the bank. On January 31, 1984, Richard Collins, a loan officer at the bank, contacted Mr. Colby concerning his failure to make the January payments. Mr. Colby explained the mechanical problems he was having with the truck and assured Collins that he would begin making one payment per week beginning February 6, 1984, to bring his payments current. On March 20, 1984, Collins again contacted Mr. Colby regarding his failure to make the January or February payments. Mr. Colby stated that his truck was still undergoing repairs but that he expected to have it back shortly. Mr. Colby promised that he would make weekly payments of $1,000 beginning March 26, 1984, until the loans were brought current. After defendants failed to make the March 26 payment, Terri Running, a vice-president at the bank, called Mrs. Colby on Friday, March 30, and asked her to come to the bank and take money out of her savings account to make the loan payments. Mrs. Colby explained that her husband was in New York and that she did not think she should take money out of their savings account until she first talked to her husband. Mrs. Colby further stated that she understood an accommodation had been reached between her husband and Collins regarding the repayment of the loans. According to Mrs. Colby, Running responded by saying that it did not matter what Collins had said because he no longer worked at the bank. Mrs. Colby then stated that her husband would be back the following Tuesday, April 3, and that they would come to the bank to discuss the matter.

On the morning of April 3, Mrs. Colby went to the bank to transfer funds from the couple's savings account to their checking account to cover certain checks she had written but was informed that the ac-

count had been frozen. Later that same day, Mr. Colby had a number of telephone conversations with Running regarding the freezing of the account and the status of the loans. Although there is some disagreement over precisely what was said during those conversations, this much is clear: sometime during the afternoon of April 3, the bank's loan committee decided to accelerate the notes, official notification of which was sent to defendants in a letter dated April 4, 1984. After learning that their notes had been accelerated, defendants made a number of attempts to get plaintiff to reconsider its decision, including offering to pledge a second mortgage on their home as additional collateral. Plaintiff, however, refused to enter into any further negotiations.

Defendants argue that the trial court erred in entering summary judgment for plaintiff since the pleadings, depositions and affidavits raised factual issues which should have been submitted to a jury. They contend a factual issue exists as to whether the parties entered into an agreement regarding the repayments of the loans, an agreement which would have estopped plaintiff from accelerating the notes. Further, although defendants readily admit that they defaulted on the two loans and that plaintiff was entitled to seize their savings account, they contend plaintiff could only claim that amount which had matured at the time of the seizure. They maintain that because the notes had not been accelerated prior to the freezing of their account, plaintiff could not legally seize the entire balance, which amounted to $9,348, but could only claim $3,302.55, an amount representing the January, February and March payments which defendants failed to make. Defendants also argue that the default was cured when plaintiff froze their account and therefore the subsequent attempt to accelerate the loans was ineffective.

Plaintiff insists that summary judgment was properly entered in its favor because there was no genuine issue of material fact in dispute and it was entitled to judgment as a matter of law. It points out that not only did defendants default on the two notes, but the security agreements expressly granted it a security interest in any moneys defendants had on deposit at the bank. Accordingly, plaintiff argues it could legally seize defendants' entire savings account under section 9—503 of the Uniform Commercial Code. The relevant portion of that section states:

> "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by

action." Ill. Rev. Stat. 1983, ch. 26, par. 9—503.

■ Whether, as defendants assert, a factual issue is raised regarding the existence of an agreement between the parties concerning the repayment of the notes is a matter we deem not essential to the resolution of the controversy presented here. Given the undisputed facts contained in the record, we conclude that plaintiff acted improperly in seizing defendants' entire savings account. Initially, we note that plaintiff's reliance on section 9—503 of the Uniform Commercial Code to justify seizing defendants' savings account and setting off those funds against the past due installments as well as the outstanding balance on the notes is wholly misplaced. Simply stated, section 9—503 has no application to the case at bar. Section 9—104(i) of the Code provides that the provisions in article 9, which includes section 9—503, do not apply "to any right of set-off." (Ill. Rev. Stat. 1983, ch. 26, par. 9—104(i).) The Comment to section 9—104(i) states that "[t]his paragraph excludes the application of Article 9 to rights of set-off" and then goes on to make the following observation: "Note that at *common law* a bank has a general right of set-off applicable to a depositor's funds. Article 9 does not affect that right." (Emphasis added.) Ill. Ann. Stat., ch. 26, par. 9—104(i), Illinois Code Comment, at 52 (Smith-Hurd 1974).

■ In light of the foregoing, plaintiff's authority to seize defendants' savings account comes not from section 9—503 of the Uniform Commercial Code but from the well-established common law rule which provides that a bank has the right to set off funds on general deposit against a debt owed by a depositor to the bank. (*Kerner v. Kinsey* (1943), 384 Ill. 180, 188; *First National Bank v. Estate of Philp* (1982), 106 Ill. App. 3d 360, 362; *Olsen v. Valley National Bank* (1968), 91 Ill. App. 2d 365; see generally 5A Banks & Banking sec. 114 (Michie 1973).) This rule, however, only applies to matured debts; a bank cannot apply funds on deposit to an unmatured indebtedness of a depositor in the absence of express authority to do so. *Bonhiver v. State Bank* (1975), 29 Ill. App. 3d 794, 804; *Faber, Coe & Gregg, Inc. v. First National Bank* (1969), 107 Ill. App. 2d 204, 209; *Gillett v. Williamsville State Bank* (1941), 310 Ill. App. 395, 408. See generally 5A Banks & Banking secs. 115b, 126 (Michie 1973); 5 Ill. L. & Prac. *Banks* sec. 193 (1953).

■ ■ Considering the record in this case, it is apparent that plaintiff acted improperly in freezing defendants' entire savings account of $9,348. Running testified in her deposition that when plaintiff froze the account on the morning of April 3, it had not yet accelerated the notes. Indeed, she stated that the decision to accelerate

was not made until later in the afternoon during a meeting of the loan committee. Consequently, when plaintiff froze the account, the only debt that had matured was $3,302.55, representing the January, February and March installments which defendants had failed to pay. It is important to observe in this regard that the notes involved here are installment notes, which were to be repaid in monthly installments on the dates specified in the notes. A default in any monthly installment did not automatically make defendants liable for the outstanding balance. This is evident from the language of the acceleration clause contained in each security agreement. The accelerating provisions state that in the event of a default, "Lender *can then* demand immediate payment of the outstanding balance of this note ***." (Emphasis added.) Plaintiff therefore only had the option to accelerate the payments upon default. It is well settled that an option to accelerate the maturity of a note for the nonpayment of an installment "requires some affirmative action on the part of the holder, evidencing his election to take advantage of the accelerating provision, and that until such action has been taken the provision has no operation." Annot., 5 A.L.R.2d 968, sec. 3, at 970 (1949).

Here, plaintiff took affirmative action indicating that it was exercising its option to accelerate the notes by means of a letter dated April 4, 1984, which provided in relevant part: "Pursuant to the terms of the note as per default, we are demanding the immediate payment of the outstanding balance in full *as of today's date*." (Emphasis added.) Because the record clearly reveals that plaintiff attempted to accelerate the notes after it had frozen defendants' savings account, this case really involves nothing more than a question of timing. Had plaintiff accelerated the notes prior to seizing defendants' account, there is no question that it could have legitimately set off the entire balance of $9,348 since the outstanding balance on the notes would have matured at the time of acceleration. (See *Olsen v. Valley National Bank* (1968), 91 Ill. App. 2d 365 (defendant bank could properly set off from plaintiffs' checking account the outstanding balance due under an installment loan where the bank had exercised its option to accelerate the payments).) However, because plaintiff had not exercised its option of acceleration when it seized defendants' account on the morning of April 3, plaintiff was only entitled to set off an amount equal to the indebtedness which had matured at that point: namely, $3,302.55.

■ Having determined that plaintiff could legitimately apply $3,302.55 against defendants' outstanding debt, a question then rises concerning the effectiveness of plaintiff's subsequent attempt to accel-

erate the notes. Defendants argue that the acceleration was ineffective since the default in their payments was cured when plaintiff froze their account. We agree. As a practical matter, once plaintiff seized the account defendants' loan payments were brought current. Instead of having a balance of $9,348, defendants' account had a balance of only $6,045.45. Consequently, there was no longer a default, and therefore there was nothing for plaintiff to accelerate.

We therefore reverse the judgment of the circuit court of Jo Daviess County. Pursuant to Supreme Court Rule 366(a)(5) (87 Ill. 2d R. 366(a)(5)), we enter summary judgment for the defendants on their counterclaim and remand the cause to the circuit court of Jo Daviess County for a hearing on the defendants' damages.

Summary judgment entered; reversed and remanded.

SCHNAKE and STROUSE, JJ., concur.