In re TONYAN CONSTRUCTION COMPANY, INC., Debtor.

TONYAN CONSTRUCTION COMPANY, INC., Plaintiff,

Eldridge and Daly, Inc., R.B. Kapus Fabricating & Supply Corp., Enterprise Ready-Mix Co., Inc., McHenry Ready-Mix Co., Inc., McHenry Sand & Gravel Co., Inc., Lakeland Distributors Co., Inc., McGladrey-Hendrickson & Co., and Woodstock Brick & Supply Co., Intervenors,

v.

McHENRY STATE BANK, Edward W. Tonyan, John J. Tonyan and Janice Tonyan, Defendants.

Bankruptcy No. 81 B 5340.
Adv. No. 81 A 1730.

United States Bankruptcy Court, N.D. Illinois, E.D.

March 7, 1983.

Michael F. Kukla, Cowlin, Cowlin & Ungvarsky, Crystal Lake, Ill., for McHenry State Bank.

Thomas S. Moore, McCarthy, Duffy, Neidhart & Snakard, Chicago, Ill., for Eldridge & Daly, Inc.

James D. Goodman, Chicago, Ill., for Tonyan Const. Co., Inc.

Bruce L. Wald, Tishler & Wald, Ltd., Chicago, Ill., for Edward W. Tonyan, John J. Tonyan, and Janice Tonyan.

John E. Cunningham, Chicago, Ill., for R.B. Kapus Fabricating & Supply Corp.

Bradley T. Koch, Holmstrom & Green, P.C., Rockford, Ill., for Enterprise Ready-Mix Co., Inc., McHenry Ready-Mix Co., Inc., McHenry Sand & Gravel Co., Inc., Lakeland Distributors Co., Inc., McGladrey-Hendrickson & Co., and Woodstock Brick & Supply Co.

## ORDER

LAWRENCE FISHER, Bankruptcy Judge.

This matter coming on to be heard upon the Amended Complaint of Debtor, Tonyan Construction Company, Inc., challenging the propriety of a setoff made by Defendant McHenry State Bank pursuant to § 553 of the Bankruptcy Code and seeking to avoid as a preference within the meaning and purview of § 547(b) of the Bankruptcy Code a transfer of property allegedly made to Defendants Edward W. Tonyan, John J. Tonyan, and Janice Tonyan, and to recover the funds offset and property transferred pursuant to § 550(a) of the Bankruptcy Code, and upon the Amended Intervening Complaint filed by Eldridge and Daly, Inc., and upon the Intervening Complaint filed by R.B. Kapus Fabricating & Supply Corp., and upon the Intervening Complaint filed by Enterprise Ready-Mix Co., Inc., McHenry Ready-Mix Co., Inc., McHenry Sand & Gravel Co., Inc., Lakeland Distributors Co., Inc., McGladrey-Hendrickson & Co., and Woodstock Brick & Supply Co., and upon the Answers and Affirmative Defenses of McHenry State Bank to the Complaints filed by Debtor and the Plaintiffs in Intervention, and upon the Answers and Affirmative Defenses of Edward W. Tonyan, John J. Tonyan, and Janice Tonyan to the Complaints filed by Debtor and the Plaintiffs in Intervention, and upon the Debtor's Answers to the Intervening Complaints filed by Eldridge and Daly, Inc. and R.B. Kapus Fabricating & Supply Corp., and

The Court having examined the pleadings filed in this matter, and having received and examined the evidence adduced, and having heard the testimony of witnesses and arguments of counsel, and having received and examined memoranda of the parties in support of their respective positions, and the Court being fully advised in the premises;

The Court Finds:

1. Debtor, Tonyan Construction Company, Inc., is a general contractor operating primarily in McHenry County, Illinois. Henry B. Tonyan is Debtor's president and majority shareholder. From October 23, 1975 to October 30, 1980, Henry B. Tonyan also owned approximately .03% of the outstanding shares of Defendant, McHenry State Bank (the "Bank"). The Bank is Debtor's only secured creditor.

Debtor first borrowed funds from the Bank sometime prior to 1976, and their business relationship is one of long standing. Debtor acted as general contractor for the construction of the bank building, and over the years, the Bank has continued to loan money to Debtor for working capital and other purposes.

2. For several years, Debtor has maintained two accounts at the Bank, Nos. 510–271 and 510–289. Bank statements for these accounts for the period January 1, 1981 through June 30, 1981 were offered and received into evidence as Plaintiff's Exhibits Nos. 4 and 5, respectively. According to the bank statements, the title of Account No. 510–271 is "Tonyan Construction Co., Inc." (the "general account") and of Account No. 510–289 is "Tonyan Construction Co., Inc. Payroll Account" (the "payroll account"). Neither account is an escrow or trust account, and checks drawn on either account are payable without restriction, as long as they bear the necessary signatures.

3. In November of 1976, Debtor reorganized its debt and entered into new financing arrangements with the Bank. Copies of a Loan Agreement, dated November 26, 1976, and a Security Agreement, dated November 30, 1976, were offered and received into evidence as McHenry State Bank Exhibit No. 6. The Loan Agreement recited that at the time of its execution, the amount of financing outstanding from the

Bank to Debtor was $300,000.00. The $300,000.00 then outstanding was to form the initial extension of credit under the agreement, which amount was to be secured by a first mortgage on Debtor's real estate located in McHenry County and commonly known as 1309 No. Borden Street, McHenry, Illinois (the "real estate"). The Loan Agreement further provided that the Bank would make additional short term loans from time to time, up to a maximum total extension of credit in the amount of $500,000.00. All such loans were to be evidenced by notes secured by the real estate mortgage referred to above as well as by a security agreement in all Debtor's furniture, fixtures, equipment, inventory, and receivables, other than job receivables.

On November 30, 1976, the Security Agreement was executed granting to the Bank a security interest in the aforementioned personal property of Debtor, whether then owned or thereafter acquired. The Security Agreement secures performance of all Debtor's obligations under the terms of the Loan Agreement, including payment of all loans made pursuant thereto.

In accordance with these agreements, a Trust Deed Note was made and delivered by Debtor to the Bank on November 30, 1976 in the principal sum of $300,000.00, with interest at the rate of 9% per annum, representing the initial extension of credit under the Loan Agreement. A copy of the Trust Deed Note was offered and received into evidence as McHenry State Bank Exhibit No. 4. The Trust Deed Note provided that Debtor would make semi-annual payments in the amount of $20,000.00 on June 1st and December 1st of each year, such payments to be first applied to accumulated interest and then to principal, until November 30, 1981, at which time the balance of principal and any accrued interest would be due and payable.

Concurrently with the making and delivery of the Trust Deed Note, Debtor executed and delivered to Thomas F. Bolger, Trustee, a Trust Deed on Debtor's real estate to secure payment of the Trust Deed Note and any additional advances to be made by the Bank pursuant to the terms of the Loan Agreement. A copy of the Trust Deed, duly recorded on November 30, 1976, was offered and received into evidence as McHenry State Bank Exhibit No. 5.

Thereafter, on December 9, 1976, the Bank filed a financing statement, Form UCC–1, with the Secretary of State of Illinois, covering each type of property interest designated as collateral in the Security Agreement. A similar financing statement, with the legal description of Debtor's real estate attached, was filed for record with the McHenry County Recorder of Deeds on December 14, 1976. Copies of these financing statements were offered and received into evidence as McHenry State Bank Exhibits Nos. 7 and 8, respectively.

4. Pursuant to the terms of the Loan Agreement, Debtor submitted periodic financial statements to the Bank, although it appears that until March of 1981, the most recent annual statement submitted by Debtor was for the period ending February 28, 1979. The Loan Agreement contained additional restrictions and conditions, including a requirement that Debtor hold regular monthly board meetings with formal minutes, copies to be submitted to the Bank for review, and a requirement that all debts incurred by Debtor to the Bank be guaranteed by officer/employee stockholders to the extent of their ownership in Debtor. Mr. Ormel J. Prust, Executive Vice-President of the Bank, testified that all debt owed by Debtor to the Bank has been guaranteed by Henry B. Tonyan. The remaining shareholder/employees have executed guarantees of Debtor's obligations in proportion to the extent of their ownership in Debtor, or approximately 4% of the total indebtedness.

5. Over the years, the Bank has made several additional advances to Debtor evidenced by short terms notes in accordance with the terms of the Loan Agreement. In December of 1980, three such notes were outstanding: one in the amount of $40,000.00, dated November 24, 1980 and due February 23, 1981, with interest at the rate

of 13% per annum; one in the amount of $75,000.00, dated December 29, 1980 and due March 30, 1981, with interest at the rate of 13% per annum; and one in the amount of $83,400, dated October 16, 1980 and due April 16, 1981, with interest at the rate of 13% per annum. Copies of the foregoing notes were offered and received into evidence as McHenry State Bank Exhibits Nos. 13, 14, and 15, respectively. Each of these notes was a renewal note.

6. During the year before the filing of the petition herein, representatives of Debtor met with bank officers on at least three occasions to discuss, *inter alia,* Debtor's financial condition and the status of its indebtedness to the Bank. One of these meetings, which took place in the offices of the Bank's President on or about November 21, 1980, was attended by Ormel Prust, Henry B. Tonyan, and two other representatives of Debtor. The discussion concerned distribution of the proceeds from the "Lincoln Towers" project, including moneys owed to subcontractors in connection therewith. The proceeds, in the amount of $257,-167.35, were being held by the Bank. At the meeting, an agreement was reached concerning distribution of the Lincoln Towers proceeds.

A November 28, 1980 letter from Ormel Prust to Henry B. Tonyan, offered and received into evidence as Plaintiff's Exhibit No. 9, refers to that meeting and indicates the Bank's intention to make certain payments on Debtor's notes from the proceeds of the Lincoln Towers settlement. The letter also acknowledges receipt of $36,600.00 from the sale of some equipment owned by Debtor and indicates that the Bank applied $20,000.00 of the equipment proceeds toward Debtor's obligations under the Trust Deed Note and $16,600.00 upon one of Debtor's short term notes.

A December 12, 1980 letter from Mr. Prust to Henry B. Tonyan, offered and received into evidence as Plaintiff's Exhibit No. 8, indicates that $101,148.01 of the Lincoln Towers proceeds was deposited by the Bank into Debtor's general account, $22,-316.85 was paid to Debtor's attorneys, an additional $20,000.00 payment was made on the Trust Deed Note, and $50,000.00 was applied in satisfaction of a short term note to the Bank due November 24, 1980. The Bank placed the remaining sum of $63,-702.49 in escrow with Chicago Title Insurance Co. on account of disputed claims of subcontractors on a previous project. This distribution was substantially in accordance with the agreement reached at the November, 1980 meeting.

7. As a result of these transactions, Debtor's outstanding obligations to the Bank on or about December 12, 1980 comprised the Trust Deed Note, with a balance of $153,942.50, and the three short term notes previously mentioned, McHenry State Bank Exhibits Nos. 13, 14, and 15. Thereafter, the $40,000.00 note dated November 24, 1980, McHenry State Bank Exhibit No. 13, was renewed in that amount on or about February 23, 1981 upon payment by Debtor of interest in the amount of $1,296.44. A copy of that renewal note was offered and received into evidence as McHenry State Bank Exhibit No. 1. The $75,000.00 note dated December 29, 1980, McHenry State Bank Exhibit No. 14, was renewed in that amount on or about March 30, 1981 upon payment by Debtor of interest in the amount of $2,430.82. A copy of that note was offered and received into evidence as McHenry State Bank Exhibit No. 2. On February 5, 1981, a $500.00 payment of principal was made on the $83,400.00 note dated October 16, 1980, McHenry State Bank Exhibit No. 15, leaving a principal balance of $82,900.00. This note was renewed in that reduced amount on or about April 16, 1981 upon payment by Debtor of interest in the amount of $2,703.08. A copy of the renewal note was offered and received into evidence as McHenry State Bank Exhibit No. 3.

8. In February, 1981, Debtor was engaged as general contractor for the construction of office and warehouse additions

to the Skokie Valley Beverage Co. ("SVB") facility located at 199 Shepard Avenue, Wheeling, Illinois. Plaintiff in Intervention, R.B. KAPUS FABRICATING & SUPPLY CORP. ("Kapus") was one of the subcontractors hired by Debtor to supply labor and materials for the SVB project. On March 2, 1981, Kapus accepted Debtor's purchase order, agreeing to furnish, install, and erect the structural steel necessary for completion of the alterations. A copy of the purchase order, offered and received into evidence as Kapus Exhibit No. 1, indicates that the total contract price was $13,473.00. Pursuant to its contract with Debtor, Kapus performed all the required work.

9. On or about February 26, 1981, Plaintiff in Intervention ELDRIDGE & DALY, INC. ("E & D") entered into a subcontract with Debtor to do the masonry work for the SVB project. The total contract price was $12,335.00, and by the end of May, 1981, E & D had completed delivery of labor and materials to the value of $10,546.42. On August 12, 1981, E & D duly perfected its mechanic's lien in that amount by filing its Notice and Claim for Lien in the Office of the Cook County Recorder of Deeds.

10. Charlene Krause, administrative assistant and auditor for Debtor, testified that she sent a letter to Kapus, on or about April 9, 1981, enclosing four copies of a partial waiver of lien, covering payment in the amount of $12,170.70, and requesting that Kapus execute and return three copies to Debtor immediately. A copy of the letter was offered and received into evidence as Kapus Exhibit No. 2. Kapus executed and returned the three copies of the waiver, retaining one copy for its files, which was offered and received into evidence as Kapus Exhibit No. 3.

Pursuant to request, E & D also submitted to Debtor a partial waiver of lien and sworn contractor's affidavit, a copy of which was offered and received into evidence as E & D Exhibit No. 1. The E & D waiver of lien recites in pertinent part as follows:

" ... for and in consideration of ... $10,546.42 ..., and other good and valuable considerations, the receipt whereof is hereby acknowledged, [E & D] does hereby waive and release any and all lien or claim or right of lien under the Statutes of the State of Illinois, relating to Mechanic's liens, on the above described premises and improvements thereon, and on the monies or other considerations due or to become due from the owner, on account of labor or services, material, fixtures or apparatus heretofore furnished to this date by [E & D] for the above described premises."

The Kapus waiver of lien contains language similar to the foregoing, except that it does not purport to waive Kapus' lien on moneys due or to become due from the owner.

Ms. Krause testified that in most cases, as with SVB, the owner of a building under construction by Debtor requires a waiver of lien from each subcontractor before funds will be released. Accordingly, Debtor prepares the waivers and forwards them to the subcontractors for signature. When the waivers are returned, Debtor submits them to the owner, the funds are released, and Debtor is then in a position to issue checks to the subcontractors.

The Bank's Executive Vice-President, Ormel Prust, testified that he had had approximately one hundred construction loans under his direction and control for payout. According to his testimony, the payout procedure described by Ms. Krause with respect to the submission of lien waivers prior to release of funds is customary in the industry.

11. After receipt of the required waivers of lien on the SVB project, Debtor submitted them to the owner, and the funds were released. Upon receipt of the funds, Debtor issued its checks to the subcontractors, including check no. 10194, dated April 17, 1981 in the amount of $10,546.42, payable to ELDRIDGE & DALY, INC., and check no. 10196, dated April 17, 1981 in the amount of $12,170.70, payable to R.B. KA-

PUS FABRICATING & SUPPLY CORP. Copies of these checks were offered and received into evidence as E & D Exhibit No. 2(b) and Kapus Exhibit No. 4, respectively.

12. On April 23, 1981, Debtor deposited the funds received from SVB into its general account at the Bank. Two deposits were made to the general account that day, in the amounts of $121,891.78 and $15,325.55, and a deposit was made to the payroll account in the amount of $2,785.34. The balance in Debtor's general account at the close of business on April 23, 1981, after the aforesaid deposits, was $132,576.80. The balance in Debtor's payroll account at the close of business on April 23, 1981 was $2,098.77.

13. On April 23, 1981, the day these deposits were made, the Bank was served with a non-wage garnishment summons in Case No. 80 CH 219 in the Circuit Court of the 19th Judicial Circuit, McHenry County, Illinois, entitled "Edward W. Tonyan, John J. Tonyan and Janice Tonyan v. Tonyan Construction Company, Inc. and McHenry State Bank." Edward W. Tonyan, John J. Tonyan, and Janice Tonyan (the "Tonyans") had been awarded judgment against Debtor on March 27, 1981 in the amount of $204,918.00, of which $184,169.90 remained unpaid. The Bank was also served with Interrogatories to Garnishee, to which it responded, *inter alia,* as follows:

" . . .

1. That when the Garnishee was served with summons it had in its possession . . . certain property belonging to the judgment debtor . . . , and in particular the following sums held on account:

| | | |
|---|---|---|
| (A) # 510–271 | | $132,551.80 |
| (B) # 510–289 | | $ 2,098.77 |
| TOTAL | | $134,650.57 |

. . . . .

3. That on the date it was served with summons and Interrogatories to Garnishee there was due and owing to it by the judgment debtor the sum of $351,842.50 . . .

4. That pursuant to the terms and provisions of Chapter 62, Section 40 of the Illinois Revised Statutes, the Garnishee hereby claims a setoff against the debt now due and owing to it by the judgment debtor, all monies now held on account on behalf of said judgment debtor.

. . . "

Accordingly, the Bank responded that it had in its possession no property belonging to Debtor which was subject to garnishment by the Tonyans.

14. Edward J. Becker, Jr., Vice-President and Cashier of the Bank, testified that he was aware of the garnishment on April 23, 1981 and debited the accounts the next day. Debtor's bank statements for the month of April, 1981 indicate that on April 24, the general account was debited in the amount of $132,576.80 and the payroll account was debited in the amount of $2,098.77, or a total of $134,675.57. The amount claimed as a setoff herein is $134,650.57. The difference between the total amount debited and the amount claimed as a setoff is attributable to a $25.00 bank service charge to the general account.

15. Plaintiff's Exhibit No. 4, the bank statements for the general account, indicate that the average daily balance during the period April 1, 1981 through April 22, 1981 was $12,474.31, with a high of $29,636.32 at the close of business on April 2, 1981. As previously mentioned, the balance at the close of business on April 23, 1981 was $132,576.80. The daily balances for the months of February and March, 1981 show a similar trend in activity, ordinarily ranging between $5,000.00 and $70,000.00, but with occasional large deposits of $115,000.00 or more. Mr. Becker, who had been with the bank for seventeen years and was familiar with Debtor's accounts, testified that the balances in each account during the months of February, March, and April of 1981 were average and that there were customarily peak balances in both Debtor's accounts. Mr. Becker further testified that he ordinarily looked at the large deposit

items, but he claimed that he did not check the source of the April 23, 1981 deposits. Later in his testimony, he stated that he could not "recall" the source of these deposits. He also stated that he knew Debtor was a construction company and that over the years, moneys owed by Debtor to subcontractors on various projects were deposited from time to time into Debtor's general account.

16. The Bank continued to honor checks drawn on each of Debtor's accounts after the setoff of April 24, 1981, on which date Debtor deposited an additional $45,527.78 into the general account. Mr. Becker stated that he looked at some of the checks presented both before and after setoff. He added that it was his custom to look at checks presented from time to time, but that he did not monitor the accounts on a daily basis.

17. By April 27, 1981, there was an overdraft in the general account, and seven checks were returned the next day. One of the checks returned on April 28, 1981 was check no. 10194 payable to E & D, E & D Exhibit No. 2(b), which had been presented on April 27, 1981. Twelve additional checks were returned on April 30, 1981, including check no. 10196 payable to Kapus, which had been presented on April 28, 1981. Kapus remains unpaid as to the $12,170.70 represented by the waiver of lien, Kapus Exhibit No. 3. E & D remains unpaid as to the $10,546.42 represented by the waiver of lien, E & D Exhibit No. 1.

18. Henry B. Tonyan was unaware of the garnishment until the day Debtor's accounts were debited. He testified that on April 24, 1981, the Bank called his office to advise him that the setoff had been made. Thereafter, on May 5, 1981, Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

19. The 90th day preceding the filing of the petition herein was February 4, 1981. See Bankruptcy Rule 906(a). The balances in Debtor's general and payroll accounts on that day were $166,404.37 and $3,802.68, respectively.

Debtor's obligations under the short term notes outstanding on February 4, 1981, McHenry State Bank Exhibits Nos. 13, 14, and 15, aggregated $198,400.00. The indebtedness under the Trust Deed Note on February 4, 1981 was $153,942.50. Accordingly, Debtor's total indebtedness to the Bank on February 4, 1981 was $352,342.50.

Debtor's obligations under the short term notes outstanding on April 24, 1981, McHenry State Bank Exhibits Nos. 1, 2, and 3, aggregated $197,900.00. The indebtedness under the Trust Deed Note on April 24, 1981 was $153,942.50. Accordingly, Debtor's total indebtedness to the Bank on April 24, 1981 was $351,842.50. The indebtedness to the Bank remained the same on the date the petition was filed.

20. None of the short term notes, McHenry State Bank Exhibits Nos. 1, 2, and 3 (bearing due dates of May 26, 1981, June 19, 1981, and July 16, 1981, respectively), were due on April 24, 1981. The Trust Deed Note, which has a final payment date of November 30, 1981, was not due on April 24, 1981; nor was any semi-annual payment due thereunder.

21. On or about the date of setoff, Debtor retained Fleming & Company, Certified Public Accountants, to examine the Debtor's books and records for the purpose of preparing financial statements. Copies of the financial statements prepared by Fleming & Company were offered and received into evidence as Plaintiff's Exhibits Nos. 1 and 2. Henry J. Fleming, Jr. testified that the unaudited statements were prepared based upon generally accepted accounting principles and on the assumption that Debtor would continue to operate. Plaintiff's Exhibit No. 2 contains a balance sheet as at May 5, 1981, the date of the filing of the petition herein. A summary of that balance sheet is as follows:

| Assets: | | Liabilities: | |
|---|---:|---|---:|
| Cash on hand and in banks | $ 63,568.57 | Notes payable | $ 584,050.04 |
| Total accounts and notes receivable ($428,291.08) minus allowance for uncollectible accounts ($90,000.00) | 338,291.08 | Judgments payable | 7,020.00 |
| | | Total accounts payable | 622,447.84 |
| Total inventories | 1,722,235.57 | Total accrued and withheld taxes | 7,456.74 |
| Estimated revenues recognized to date | 104,197.69 | Total accrued expenses | 61,920.10 |
| Total prepaid expenses | 43,666.00 | Billings to date on construction contracts | 1,749,837.68 |
| Building and improvements | 6,725.08 * | | |
| Land and land improvements at cost | 30,589.16 | | |
| Machinery and equipment | 1,870.59 * | | |
| Autos and trucks | 22,420.69 * | | |
| Furniture and fixtures | 6,841.57 * | | |
| TOTAL ASSETS | $2,340,406.00 | TOTAL LIABILITIES | $3,032,732.40 |

\* At cost minus accumulated depreciation

22. An appraisal of Debtor's real estate prepared by H.F. Harrison & Associates was offered and received into evidence as Plaintiff's Exhibit No. 6. The appraisal report indicates a fair market value for the real estate as of April 11, 1975 in the amount of $380,000.00. Mr. Prust testified that in granting Debtor the $300,000.00 loan in November of 1976, the Bank relied in part upon the 1975 appraisal.

Henry B. Tonyan, who had experience in appraising industrial properties in the area, testified that in the six years since the appraisal, the real estate had appreciated in value to $500,000.00.

23. Debtor contends, *inter alia,* that the Bank had no right of setoff because its claims against Debtor were not mature on April 24, 1981; that the setoff will effect a preference to the Bank; and that even if the setoff is otherwise valid under § 553, the Court has some discretion in the application of that section to reorganization proceedings under Chapter 11 of the Bankruptcy Code.

Debtor also seeks avoidance of the garnishment lien as a preference, arguing that the Tonyans would receive by virtue of the garnishment more than they would have received in a liquidation proceeding filed on May 5, 1981. The Tonyans not only deny that they would receive pursuant to garnishment more than they would have received in a Chapter 7 case, but also urge that in any event, they should be required to disgorge only that amount which exceeds the hypothetical Chapter 7 dividend.

Kapus and E & D seek the imposition of a trust on the funds received by Debtor from SVB pursuant to the waivers of lien. They also contend that they are entitled to such funds by virtue of the lien created under § 21 of the Illinois Mechanics Lien Act, Ill.Rev.Stat. ch. 82, § 21.

Finally, it is the contention of Enterprise Ready-Mix Co., Inc. and the other unsecured creditor intervenors that the bank improved its position within the purview of § 553(b) of the Bankruptcy Code.

The Court Concludes and Further Finds:

1. Assuming that the Bank's setoff pursuant to § 8 of the Illinois Garnishment Act, Ill.Rev.Stat. ch. 62, § 40, was valid, the Tonyans obtained nothing through the garnishment proceedings. § 7 of the Act, Ill. Rev.Stat. ch. 62, § 39, provides, *inter alia,* that the judgment creditor obtains a lien "... on the indebtedness and other property held by the garnishee at the time of service of the garnishment summons ..." When the Bank was served with garnishment summons, it owed Debtor no more

than $134,675.57. After setoff, it held no indebtedness or other property subject to the garnishment of April 23, 1981. The garnishment did not reach debts incurred by the Bank thereafter.

■ 2. Even assuming the setoff were invalid, the garnishment lien would nevertheless be avoidable as a preference. § 547(b) of the Bankruptcy Code provides as follows:

"(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

If there were no valid setoff, the service of the garnishment summons created a lien, which is a "transfer" within the purview of the above-quoted provision. The transfer was to a creditor of Debtor, on account of an antecedent debt, made within ninety days before the filing of the petition herein, while debtor is presumed to have been insolvent. See 11 U.S.C. § 547(f).

The last requirement, viz., that the transfer enabled the Tonyans to receive more than they would receive in a Chapter 7 liquidation filed on May 5, 1981, has also been proved. According to Plaintiff's Exhibit No. 2, the book value of Debtor's assets on May 5, 1981 totalled $2,340,406.00. Assuming that upon liquidation, Debtor's real estate could be sold for its full fair market value, or $500,000.00 as testified to by Henry B. Tonyan, the total assets as of May 5, 1981 would be increased to $2,803,091.70. Deducting from this amount the $351,842.50 owed to the Bank on May 5, 1981, approximately $2,451,249.20 in assets would have been available for unsecured creditors on that date. Debtor's liabilities as of May 5, 1981, excluding the debt owed to the Bank, aggregated $2,680,889.90, resulting in a hypothetical dividend to unsecured creditors of approximately 91%. The actual dividend, however, would be much lower, not only because all administrative expenses and other priority claims would first have to be satisfied in full, but also because it is extremely unlikely that Debtor's inventory and accounts receivable could be liquidated for their full book value.

Unless Debtor's assets at May 5, 1981 were sufficient to provide in liquidation a 100% distribution to the unsecured creditors, any creditor holding an unsecured claim who received a partial payment during the ninety day preference period would be in a position to receive more than he would have received in a Chapter 7 liquidation. *See Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936). By no stretch of the imagination would Debtor's unsecured creditors have received a 100% distribution in a case under Chapter 7. Accordingly, even if the Bank's setoff were invalid, the Tonyans' garnishment lien would be avoidable as a preference.

The Tonyans' final contention, that they should be required to pay to this estate only that amount of the property preferentially transferred which exceeds the hypothetical Chapter 7 dividend, is also without merit. As already stated, the Tonyans took nothing through the garnishment proceedings,

but even if they had, the evidence concerning Debtor's assets and the value thereof as of May 5, 1981 is insufficient to establish precisely the distribution to unsecured creditors on that date. More importantly, however, the language of the statute, 11 U.S.C. §§ 502(d), 547, and 550, does not support such a construction, nor does the general policy of the preference provision " . . . to discourage unusual action by either the Debtor or his creditors during the Debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6329. If the Tonyans' position were adopted, the effectiveness of the preference provision in furthering this policy would be greatly diminished.

■ 3. As to the subcontractor intervenors, the Court finds that they cannot prevail by virtue of a mechanics' lien under § 21 of the Illinois Mechanics Lien Act, Ill.Rev.Stat. ch. 82, § 21. That section provides in relevant part as follows:

" . . . [E]very mechanic, worker or other person who shall furnish any materials, apparatus, machinery or fixtures, or furnish or perform services or labor for the contractor, or shall furnish any material to be employed in the process of construction . . . shall be known under this act as a sub-contractor, and shall have a lien for the value thereof, with interest on such amount from the date the same is due, from the same time, on the same property as provided for the contractor, and, also, as against the creditors and assignees, and personal and legal representatives of the contractor, . . . on the moneys or other considerations due or to become due from the owner under the original contract. . . ."

The E & D waiver of lien waived and released any lien to which E & D might otherwise be entitled under the aforesaid statutory provision, not only as to the premises and improvements, but also as to the moneys or other considerations due or to become due from the owner. E & D suggests that the lien waiver is of no force or effect because of a failure of consideration. While the decisions are not uniform on this point, the better reasoned authorities hold that a lien waiver may not be repudiated for lack of consideration. *See, e.g., William Aupperle & Sons, Inc. v. American National Bank & Trust Co. of Chicago,* 28 Ill.App.3d 573, 577, 329 N.E.2d 458 (1975); *Capitol Plumbing and Heating Supply Co. v. Snyder,* 104 Ill.App.2d 431, 244 N.E.2d 856, 860–61 (1969); *see also H.G. Wolff Co. v. Gwynne,* 246 Ill.App. 86, 89–91 (1927); Kratovil and Rohde, *Mechanics' Lien Waivers and the Requirement of Consideration,* 14 De Paul L.Rev. 243 (1965).

The Kapus lien waiver does not purport to waive the lien on moneys due or to become due from the owner. According to the caselaw, a subcontractor may so limit his waiver of lien. *See Douglas Lumber Co. v. Chicago Home for Incurables,* 380 Ill. 87, 100, 43 N.E.2d 535 (1942); *Bethlehem Steel Corp. v. Tishman-Adams, Inc.,* 45 Ill.App.3d 1003, 1008, 4 Ill.Dec. 539, 360 N.E.2d 475 (1977). Here, however, the owner has already disbursed the funds to Debtor. The funds were then deposited into Debtor's general account and used as an offset by the Bank. Under these circumstances, there are no moneys " . . . due or to become due from the owner under the original contract . . ." within the meaning and purview of § 21 of the Illinois Mechanics Lien Act. Accordingly, neither Kapus nor E & D can recover by virtue of a mechanics' lien on the subject funds.[1]

■ 4. The Court nevertheless finds that on principles of equity and justice, the funds deposited into Debtor's general account should be impressed with a trust to the extent of $22,717.12, the total of funds paid pursuant to the Kapus and E & D lien waivers. These funds were released to Debtor for the specific purpose of paying the two subcontractors to whom they were due and would not have been released but

1. It should also be observed that there was no evidence that Kapus timely perfected its lien in accordance with Ill.Rev.Stat. ch. 82, § 7.

for the waivers of lien. Debtor was acting merely as the conduit for the funds between SVB and the subcontractors. *See Carrier Corp. v. J.E. Schecter Corp.,* 347 F.2d 153, 155–56 (2d Cir.1965); *In re H.G. Prizant & Co.,* 257 F.Supp. 145, 147 (N.D.Ill. 1965). It should also be observed that § 21.01 of the Illinois Mechanics Lien Act, Ill.Rev.Stat. ch. 82, § 21.01, provides criminal penalties for a general contractor's fraudulent failure to pay funds due to subcontractors. While there is no fraudulent intent here on the part of Debtor, the provision nevertheless lends support to a finding that the subcontractors are the beneficial owners of the funds. *See In re D & B Electric, Inc.,* 4 B.R. 263, 269 (Bkrtcy.W.D. Ky.1980).

In *In re H.G. Prizant & Co., supra,* one of the debtor's subcontractors accepted a post-dated check in return for his waiver of mechanics' lien against the real estate upon which the construction project was located. Thereafter, the debtor received the funds from the owner, deposited them in its bank account, and on the same day filed a Chapter XI proceeding. The subcontractor petitioned the bankruptcy court to impress a trust upon the funds received from the owner, but the bankruptcy judge denied relief. On review, the district court reversed, holding, *inter alia,* as follows:

> "Where, as here, funds are turned over to a debtor for the *special purpose* of paying same to a third party to whom they are due, a court of equity is free to act to achieve the intended result."

*Id.* at 147. This Court is a court of equity and finds that in the circumstances of this case, a similar result is warranted. *See Carrier Corp. v. J.E. Schecter Corp., supra; Georgia Pacific Corp. v. Sigma Service Corp.,* 22 B.R. 984 (D.C.M.D.La.1982); *In re D & B Electric, Inc., supra* at 268–70; *see also Limperis v. Material Service Corp.,* 415 F.Supp. 65, 69 (N.D.Ill.1976). Accordingly, a trust will be impressed, to the extent of $22,717.12, upon the funds received by Debtor from SVB and deposited into its general account at the Bank on April 23, 1981.

5. Ordinarily, where a party deposits funds in a bank, the funds become the property of the bank and the bank becomes the debtor of the depositor. *See United States v. Butterworth-Judson Corp.,* 267 U.S. 387, 394, 45 S.Ct. 338, 340, 69 L.Ed. 672 (1925); *Liberty Savings Association v. Sun Bank of Jacksonville,* 572 F.2d 591, 595 (7th Cir.1978); *Live Stock Exchange, Inc. v. State Bank of Roseville,* 249 Ill.App. 44, 49 (1928). In such a case, there is mutuality of obligation, out of which the bank's right of setoff arises. *United States v. Butterworth-Judson, supra; Kaufman v. First National Bank of Opp, Alabama,* 493 F.2d 1070, 1072 (5th Cir.1974); 5A Michie, Banks and Banking § 115c, at 309 (1973). This right of setoff exists even where trust funds are deposited to the individual account of a fiduciary, or where funds held for the use of or as security for another are credited to the depositor's individual account. *See Kaufman v. First National Bank of Opp, Alabama, supra; In re Goodson Steel Corp.,* 488 F.2d 776, 780–81 (5th Cir.1974); *Kamfner v. Auburn Park Trust and Savings Bank,* 344 Ill. 200, 206, 176 N.E. 363 (1931); 5A Michie, *supra,* § 132. Where, however, a bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of setoff is subject to the rights of such third party. *United States v. Butterworth-Judson Corp., supra* 267 U.S. at 395, 45 S.Ct. at 340; *Union Stock Yards Bank v. Gillespie,* 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724 (1890); *Liberty Savings Association v. Sun Bank of Jacksonville, supra* at 596; *Clemmer v. Drovers' National Bank,* 157 Ill. 206, 216, 41 N.E. 728 (1895); *Bonhiver v. State Bank of Clearing,* 29 Ill.App.3d 794, 794, 805, 331 N.E.2d 390 (1975); *Live Stock Exchange, Inc. v. State Bank of Roseville, supra* at 52–53. Knowledge that a depositor's business customarily requires the handling of funds in which others have an interest, coupled with other circumstances of equitable cognizance tending to individualize a deposit or line of deposits, may constitute notice of facts suf-

ficient to put the depositary bank upon inquiry as to the true nature of the deposit. *Union Stock Yards Bank v. Gillespie, supra* 137 U.S. at 415–16, 11 S.Ct. at 119–20; *see Clemmer v. Drovers' National Bank, supra; see also American National Bank v. National Indemnity Co.,* 222 F.2d 513 (8th Cir. 1955).

■ 6. The Court finds that in this case the Bank had such inquiry notice with regard to Debtor's April 23, 1981 deposit, and its right of setoff is accordingly subject to the subcontractors' interests in the funds. The evidence indicates that over the years, the Bank maintained close scrutiny of Debtor's affairs, reviewing periodic financial statements and holding meetings at which Debtor's business affairs and financial condition were discussed. At least three such meetings took place during the year before the filing of the petition. In November of 1980, the Bank was holding the proceeds from Debtor's Lincoln Towers project, and at the meeting held that month, the Bank played a significant role in determining the distribution of those proceeds. Thereafter, the Bank implemented the distribution, placing a substantial portion of the funds in escrow to satisfy the disputed claims of certain subcontractors. Plaintiff's Exhibit No. 9, the November 28, 1980 letter written by Mr. Prust, further shows the Bank's involvement in the distribution of proceeds from the sale of Debtor's equipment.

In light of the close and continuing involvement with Debtor's business affairs, the Bank was undoubtedly aware of Debtor's work on the SVB project. The April 23, 1981 deposit of the proceeds from that project increased the balance in Debtor's general account by more than $120,000.00. The balance at the close of business on the previous day was only $4,413.77, and the average daily balance for the month was $12,182.42. Mr. Becker testified that Debtor's accounts regularly showed such peak balances and that it was his custom to investigate the source of these large deposits. He claimed, however, that he did not check the source of the April 23d deposits and later stated that he could not recall the source.

The Court finds Mr. Becker's testimony in this regard disingenuous at best. He knew Debtor was in the construction industry acting as general contractor and that the high balances in Debtor's accounts were occasioned by large deposits representing payouts on construction projects. He also knew that these large deposits would include moneys due to Debtor's subcontractors. Mr. Prust, who had had more than one hundred construction projects under his direction and control for payout, testified that it was customary for subcontractors to submit waivers of lien before receiving payment in order to initiate the flow of funds from the owner. In light of his awareness of Debtor's financial condition during the months prior to bankruptcy, he knew or should have known that Debtor would be unable to pay its subcontractors without first obtaining funds from the project owner. He also knew that a deposit as large as that made by Debtor on April 23d would constitute proceeds from a construction project, with a substantial portion representing moneys owed to subcontractors.

Given the Bank's custom of checking such large deposit items, as well as its close involvement with Debtor over the years, it would have been a relatively simple matter to ascertain that the deposit in question constituted proceeds from the SVB project, including the $22,717.12 owed to Kapus and E & D. The Bank will be deemed under these circumstances to have had notice of this information, which reasonable inquiry would have revealed. Its right of setoff is accordingly subject to the interests of Kapus and E & D in the funds.

■ 7. As between the Bank and Debtor, the remainder of the funds were properly applied upon Debtor's obligations to the Bank. The requisite mutuality existed,[2] out

---

2. This is true even though the check may not have cleared by the time of setoff. The debtor-creditor relation between a bank and its deposi-

tor is conditionally established when a check is deposited. If the check is collected, the relation ceases to be conditional and becomes ab-

of which the Bank's right of setoff arose. This is true even as to funds on deposit in Debtor's payroll account. Checks drawn on that account and bearing the necessary signatures are payable without restriction. Unlike the moneys owed to the subcontractors, the funds on deposit in Debtor's payroll account are not trust funds or funds held for the use of or as security for another, within the purview of the rule previously discussed. Accordingly, the balance in the payroll account constituted a general deposit subject to the Bank's right of setoff. *See In re Goodson Steel Corp., supra* at 779–81; *Ribaudo v. Citizens National Bank of Orlando,* 261 F.2d 929, 933 (5th Cir.1958); *see also Killoren v. First National Bank in St. Louis,* 127 F.2d 537, 540–43 (8th Cir. 1942).

■ 8. Debtor's contention that the Bank's claim to a setoff must fail because neither the Trust Deed Note nor any of the short term notes was due at the time of setoff is without merit.

After the commencement of a case under title 11, an offset of claims absolutely owing by the debtor but not presently due is generally permitted, provided the party seeking the setoff complies with the requirements of § 362 of the Bankruptcy Code.[3] The underlying rationale is that the filing of the petition "... operates as the acceleration of the principal amount of all claims against the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S. Code Cong. & Admin.News 1978, p. 6309; *In re Princess Baking Corp.,* 5 B.R. 587, 590 (Bkrtcy.S.D.Cal.1980).

The law is not as clear, however, regarding the validity of such a setoff prior to bankruptcy. Collier on Bankruptcy suggests that in certain situations, the existence *vel non* of a right of setoff will initially depend on applicable nonbankruptcy law:

"... [R]egardless of where the right is invoked, whether a setoff of existing obligations may be effected or sustained in

bankruptcy depends wholly upon the terms of section 553, and not upon the terms of state laws or statutes. Only where the situation is one that section 553 does not prescribe for or regulate, will the courts apply the law of a state in connection with matters of substantive law relating to the asserted right of setoff ..."

4 Collier on Bankruptcy ¶ 553.06 at 553–38 (15th ed. 1979). This view is supported by the language of § 553, which provides in relevant part as follows:

"Except as otherwise provided in this section and in sections 362 and 363 of this title, this title *does not affect* any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ..." (Emphasis added.)

Former § 68 of the Bankruptcy Act, the predecessor to the above-quoted provision, was similarly interpreted as recognizing, but not creating, the right of setoff. *Studley v. Boylston National Bank,* 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913); *Farmers Bank of Clinton, Missouri v. Julian,* 383 F.2d 314, 324 (8th Cir.1967). "The right is one that exists in equity, and the ... Bankruptcy Act [did] not disturb it." H.R.Rep. No. 595, 95th Cong., 1st Sess. 183 (1977), U.S.Code Cong. & Admin.News 1978, p. 6143.

Collier concludes as follows regarding the existence of a right to setoff unmatured claims prior to bankruptcy:

"Under section 553(a), any right of a creditor to offset an unmatured claim against the debtor against a debt (deposit account) owed by the bank to the debtor will be preserved. However, section 553(a) does not create a right of setoff in this situation where there is no right to

---

solute as of the date of the deposit. *Lewis v. West Side Trust & Savings Bank,* 376 Ill. 23, 35, 32 N.E.2d 907 (1941).

3. Such an offset would also be subject to the terms and provisions of Sections 361 and 363 of the Bankruptcy Code.

setoff a debt against an unmatured claim under applicable nonbankruptcy law."

4 Collier, *supra*, ¶ 553.16 at 553–81.

The Court agrees that the right to a setoff of unmatured claims prior to bankruptcy is not specifically regulated by § 553, and applicable nonbankruptcy law must be consulted to determine whether such a right exists. If it does, then a determination must be made whether that right can be sustained under § 553, upon the terms of which the enforceability of the setoff ultimately depends.

In Illinois, as in most other jurisdictions, a bank cannot ordinarily apply a deposit to an unmatured indebtedness of the depositor. *Bonhiver v. State Bank of Clearing, supra* 29 Ill.App.3d at 804, 331 N.E.2d 390; *Faber, Coe & Gregg, Inc. v. First National Bank of Chicago,* 107 Ill.App.2d 204, 209, 246 N.E.2d 96 (1969); 5A Michie, *supra,* § 115. The majority of jurisdictions recognize an exception to this rule where the depositor is insolvent. 10 Am.Jur.2d *Banks* § 670 (1963). Under Illinois law, a specific exception is created in the context of garnishment proceedings. § 8 of the Illinois Garnishment Act, Ill.Rev.Stat. ch. 62, § 40, provides in relevant part as follows:

"§ 40. Deductions and set-offs of garnishee

The garnishee is entitled to assert against indebtedness due to the judgment debtor offsetting demands against either or both the judgment creditor and the judgment debtor, *whether (1) due at the time of service of the garnishment summons or thereafter to become due ...*" (Emphasis added.)

In the instant case, the Bank's setoff is claimed pursuant to the above-quoted provision. Accordingly, the Bank has a right, under applicable nonbankruptcy law, to setoff its unmatured claims against Debtor. This right is sustainable under the terms and provisions of § 553, which preserves a creditor's right to offset its "claims" against the debtor. "Claim" is defined in § 101(4) of the Bankruptcy Code as specifically including unmatured claims.[4]

■ 9. Debtor's further contention that the setoff of the funds in controversy constitutes a preference within the purview of § 547 of the Bankruptcy Code must also fail.[5]

In order to establish a voidable preference, a "transfer" of the debtor's property must be proved. "Transfer" is defined in § 101(40) of the Bankruptcy Code as including every method of disposing of or parting with an interest in property. Ordinarily, a

4. Debtor also suggests that the right of setoff should somehow be limited because the Bank is amply protected by collateral security. The right of a bank to setoff secured claims is not specifically regulated by § 553, and applicable nonbankruptcy law must be consulted. Under Illinois law, the existence of collateral security will not defeat the right of setoff. Ill.Rev.Stat. ch. 62, § 40 provides in relevant part as follows:

"... To the extent (1) that other property (a) belonging to the judgment debtor or (b) in which the judgment debtor has an interest is pledged to or held by the garnishee in good faith as security or (2) that the garnishee has other just claim against the other property, the garnishee is entitled to retain the other property. The garnishee is liable (1) for the balance of indebtedness due the judgment debtor after the offsetting demands are adjusted and (2) for the balance of other property after deducting property to which the garnishee has just claim...."

See *Bee Jay's Truck Stop, Inc. v. Department of Revenue,* 86 Ill.App.3d 7, 12–13, 41 Ill.Dec.

257, 407 N.E.2d 755 (1980). The same rule prevails in Illinois even outside the context of garnishment proceedings. *Olsen v. Valley National Bank,* 91 Ill.App.2d 365, 369–71, 234 N.E.2d 547 (1968). Such a setoff, made without regard to the existence of collateral security, is sustainable under the terms of § 553.

5. While not within the scope of the pleadings, Debtor also maintained at trial that payment in full of the short term notes, McHenry State Bank Exhibits Nos. 13, 14, and 15, with the proceeds of renewal notes, McHenry State Bank Exhibits Nos. 1, 2, and 3, was made within the ninety day pre-bankruptcy period and constitutes a voidable preference. This contention cannot be sustained. See *First National Bank of Clinton v. Julian,* 383 F.2d 329, 334 (8th Cir.1967). Nor is the Bank barred from using these claims as an offset by virtue of § 553(a)(2). Debtor fails to recognize that that provision applies only to claims that have been transferred to the creditor by an entity other than the debtor.

deposit in an unrestricted checking account does not constitute a parting with property, because it "... results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against ..." *Citizens' National Bank of Gastonia, N.C. v. Lineberger*, 45 F.2d 522, 527 (4th Cir.1930). But if the deposit is really "... the cloak for some other transaction, such as payment or the giving of security; ... equity, which looks through form to substance, will treat the transaction according to its real nature." *Id.* at 527–28. *See New York County National Bank v. Massey*, 192 U.S. 138, 147–49, 24 S.Ct. 199, 201–02, 48 L.Ed. 380 (1904); *In re Applied Logic Corp.*, 576 F.2d 952, 962 (2d Cir.1978). Accordingly, if the deposit is not made in the regular course of business and subject to withdrawal at the will of the depositor, but is made or accepted for the purpose of effecting payment to the bank, then the deposit and subsequent setoff may constitute a transfer within the purview of § 547. *See In re Applied Logic Corp., supra; Katz v. First National Bank of Glen Head*, 568 F.2d 964, 970 (2d Cir.1977); *Jensen v. State Bank of Allison*, 518 F.2d 1, 4 (8th Cir.1975); *Cusick v. Second National Bank*, 115 F.2d 150, 152 (D.C.Cir.1940). The cases so holding have now been codified as subsection (a)(3) of § 553 of the Bankruptcy Code. H.R.Rep. No. 595, 95th Cong., 1st Sess. 185 (1977).

In the instant case, the evidence falls far short of proving a transfer for preference purposes. Debtor's accounts at the Bank were of long standing and continuously active, showing occasional high balances representing deposits of construction project proceeds. The large deposits of April 23, 1981 constituted proceeds from the SVB project, and there. is nothing to indicate that they were made other than in .the ordinary course of business and subject to withdrawal at Debtor's will.

Although the Bank's Vice-president and Cashier, Mr. Becker, looked at some of the checks presented both before and after set-off, he stated that this was his custom, and the Bank continued to honor checks drawn on each account after the deposits were made. Moreover, the Bank made the setoff in response to a garnishment summons, which totally negatives any intent on its part to accept the deposits as a means of effecting payment.

The fact that Henry B. Tonyan is a former shareholder of the Bank [6] and guarantor of Debtor's obligations under the notes does not change this result. At the time of setoff, numerous checks were outstanding against the deposits. The evidence is clear that Mr. Tonyan fully intended the deposits to be. withdrawable at Debtor's will.

It should also be noted that another essential element of a preferential transfer has not been proved, viz., that the alleged transfer will enable the Bank to receive more than it would have received in a case under Chapter 7. As a fully secured creditor, the Bank would have received payment in full in a Chapter 7 liquidation.

10. In a final attempt to defeat the Bank's setoff, Debtor cites a series of decisions holding that in the context of reorganization proceedings, the application of the setoff provisions is discretionary with the Court. *See, e.g., Lowden v. Northwestern National Bank & Trust Co.*, 298 U.S. 160, 56 S.Ct. 696, 80 L.Ed. 1114 (1936); *Susquehanna Chemical Corp. v. Producers Bank & Trust Co.*, 174 F.2d 783 (3d Cir.1949); *see also Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). None of these authorities involves a pre-petition setoff and all were decided un-

---

**6.** Debtor suggests that its transactions with the Bank prior to the ninety day pre-bankruptcy period may be voidable as insider preferences, because Mr. Tonyan held shares in the Bank within the year before the filing of the petition. Mr. Tonyan's shareholdings would not render the Bank an insider within the purview of § 101(25) of the Bankruptcy Code. Even as-

suming, however, that the Bank were an insider for some other reason, Debtor has failed to prove essential elements of such a preferential transfer, including insolvency prior to the ninety day pre-bankruptcy period and the requirement that the Bank will receive more than in a case under Chapter 7.

der the former Bankruptcy Act. The problems with which they dealt have now been specifically provided for in § 553 of the Bankruptcy Code, which subjects any post-petition setoff to the requirements of sections 362 and 363 concerning the automatic stay of setoff, the use of property subject to setoff, and adequate protection.

The decisions cited by Debtor never had, nor do they now have under the Bankruptcy Code, any application to a setoff made prior to the filing of the petition.

11. The Bank did not improve its position within the purview of § 553(b) of the Bankruptcy Code, and it may retain all of the funds offset, with the exception of the moneys owed to Kapus and E & D. § 553(b) provides as follows:

"(b)(1) ... [I]f a creditor offsets a mutual debt owing to the debt or against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, 'insufficiency' means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim."

On February 4, 1981, the 90th day preceding the filing of the petition herein, the balances in Debtor's general and payroll accounts totalled $170,207.05, and Debtor's obligations to the Bank under the Trust Deed Note and the short term notes totalled $352,342.50. Accordingly, the insufficiency on February 4, 1981, within the purview of the above-quoted provision, was $182,135.45.

On the date of and prior to the setoff, the balances in Debtor's general and payroll accounts totalled $134,650.57, and Debtor's

obligations to the Bank under the Trust Deed Note and the short term notes totalled $351,842.50. Accordingly, the insufficiency on April 24, 1981 was $217,191.93.

The insufficiency on the date of setoff was greater than that on the 90th day preceding the filing of the petition, and there is nothing for the Debtor to recover from the Bank under § 553(b).

12. The Bank has failed to prove its entitlement to costs incurred in connection with this proceeding.

13. The Court finds and deems this Order is an order within the purview of section D(2) of the General Order of the United States District Court for the Northern District of Illinois, entered on December 20, 1982 by the Honorable Frank J. McGarr, and is accordingly reviewable pursuant to section E(2)(a)(i) of that General Order only upon the timely filing of a notice of appeal.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Amended Complaint of Debtor, Tonyan Construction Company, Inc., to recover certain funds offset and property transferred, be, and the same is hereby denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Amended Intervening Complaint of Eldridge & Daly, Inc. for the recovery of funds offset in the amount of $10,546.42 be, and the same is hereby allowed.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Intervening Complaint of R.B. Kapus Fabricating & Supply Corp. for the recovery of funds offset in the amount of $12,170.70 be, and the same is hereby allowed.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Intervening Complaint of Enterprise Ready-Mix Co., Inc., McHenry Ready-Mix Co., Inc., McHenry Sand & Gravel Co., Inc., Lakeland Distributors Co., Inc., McGladrey-Hendrickson & Co., and Woodstock Brick & Supply Co. to set aside the setoff exercised by McHenry State Bank and for the return of funds to the estate of Debtor be, and the same is hereby denied.

IT IS FURTHER ORDERED that Plaintiff in Intervention, Eldridge & Daly, Inc., recover of Defendant, McHenry State Bank, the sum of TEN THOUSAND FIVE HUNDRED FORTY–SIX and 42/100 ($10,546.42) DOLLARS.

IT IS FURTHER ORDERED that Plaintiff in Intervention, R.B. Kapus Fabricating & Supply Corp., recover of Defendant, McHenry State Bank, the sum of TWELVE THOUSAND ONE HUNDRED SEVENTY and 70/100 ($12,170.70) DOLLARS.